**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK SHAFFER, MARGARET MAULDIN, CHARAFEDDINE ZAITOUN, and MARC LESSIN, Individually and on Behalf of All Others Similarly Situated, individually and on behalf of all others similarly situated, | No. 1:20-cv-01145-RJL |
| | |
| Plaintiffs, | JURY TRIAL DEMANDED |
| | |
| v. | |
| | |
| THE GEORGE WASHINGTON UNIVERSITY and THE BOARD OF TRUSTEES OF GEORGE WASHINGTON UNIVERSITY, | |
| | |
| Defendants. | |

**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.     NATURE OF ACTION ..................................................................................................1

II.    JURISDICTION AND VENUE .....................................................................................4

III.   PARTIES .......................................................................................................................5

       A.     Plaintiffs ............................................................................................................5

       B.     Defendants .........................................................................................................7

IV.    FACTS ...........................................................................................................................7

       A.     Background .........................................................................................................7

       B.     Plaintiffs Contracted with Defendants for On-Campus Classes And Access
              To Facilities .....................................................................................................12

       C.     The Novel Coronavirus Shutdowns And Defendants' Campus Closure ..............17

       D.     Defendants' Refusal To Issue Tuition And Fee Refunds .......................................18

V.     CLASS ACTION ALLEGATIONS .............................................................................25

VI.    CAUSES OF ACTION .................................................................................................28

       COUNT I  BREACH OF CONTRACT..............................................................................28

       COUNT III  UNJUST ENRICHMENT.............................................................................32

       COUNT IV  CONVERSION.............................................................................................34

PRAYER FOR RELIEF ............................................................................................................35

JURY DEMAND .......................................................................................................................35

Plaintiffs Mark Shaffer, Margaret Mauldin, Charafeddine Zaitoun, and Marc Lessin ("Plaintiffs"), individually and on behalf of all others similarly situated, for their Class Action Complaint against Defendants The George Washington University and the Board of Trustees of George Washington University ("Defendants" or "GW"), based upon personal knowledge as to their own actions and based upon the investigation of counsel regarding all other matters, complain as follows:

## I.      NATURE OF ACTION

1.      This case arises during a time of hardship for many Americans, with each day bringing different news regarding the novel coronavirus COVID-19. Social distancing, shelter-in-place orders, and efforts to "flatten the curve" prompted colleges and universities across the country to shut down their campuses, evict students from campus residence halls, and switch to online "distance" learning during the Spring 2020 semester.

2.      Despite sending students home, transitioning to online instruction, and closing its campuses, GW continued to charge full tuition and fees for the Spring 2020 semester as if nothing changed, continuing to reap the financial benefit of millions of dollars in payments from students. GW did so despite students' complete inability to continue school as normal, occupy campus buildings and facilities, or avail themselves of school programs, services, and events. So while students enrolled and paid Defendants for a comprehensive on-campus academic experience, Defendants instead offered Plaintiffs and the Class Members something far less: a limited online experience presented by Google or Zoom, void of face-to-face faculty and peer interaction, separated from program resources, and barred from facilities vital to a well-rounded, on-campus educational experience. This is not what Plaintiffs, students, and Class Members bargained for.

-1-

3.      In response to COVID-19, on March 10, 2020, GW President Thomas J. LeBlanc announced that following Spring Break, all on-campus classes were being shifted online until April 5, 2020. LeBlanc also announced that all student organization activities and events were suspended. On March 16, 2020, President LeBlanc announced the virtual learning would be extended through the end of the Spring semester. All on-campus events were cancelled.

4.       GW recognized that moving classes online presented problems. As a result, students were offered a pass/no pass option instead of letter grades for most courses. In addition, on March 23, 2020, President LeBlanc acknowledged that "the interruptions to our students' daily lives and the uncertainty the pandemic has caused have been unprecedented." Despite this, President LeBlanc provided no guidance or offers to reimburse any portion of students' tuition or fees.

5.      Despite the provision of an entirely remote college and graduate studies experience, Defendants refuse to refund or reimburse Plaintiffs and similarly situated GW students and their parents or guardians the fees they paid for services they are not being provided, events they cannot attend, and programs and activities that have been curtailed, discontinued, or closed.

6.      Defendants also refuse to refund or reimburse Plaintiffs and the Class for tuition paid for online classes that Defendants provided that are substantially less valuable than the in-person classes that Defendant had advertised and promised, and for which Plaintiffs and the Class registered and paid. This is true in spite of the fact that GW has recognized the lesser value

of online-only courses by offering courses originally planned to be conducted online at much lower rates that courses offered on campus.[1]

7.      Essentially, students have paid GW for high-quality, in-person instruction that is no longer available to them, access to buildings they can no longer enter, technology, programs and services that GW is no longer providing, and activities that are no longer available.  GW is thus profiting from COVID-19 while further burdening students and their families—many of whom have been laid off, become ill, lost loved ones, or are otherwise already bearing the brunt of the COVID-19 pandemic.  The result is an enormous windfall to GW.  GW has admitted that it has not provided what Plaintiffs and Class members bargained and paid for, acknowledging that online classes were "not how our students expected to complete their classes this spring."[2] Both contract and equity demand that GW disgorge its ill-gotten funds.

8.      Defendants' actions have financially damaged Plaintiffs and the Class Members. They have lost the benefit of their bargain and/or suffered out-of-pocket loss and are entitled to recover compensatory damages, trebling where permitted, and attorney's fees and costs. This lawsuit seeks disgorgement and monetary damages in the amount of prorated, unused amounts of tuition and fees that Plaintiffs and the other Class members paid, the benefits of which will not be provided by Defendants. This includes the difference in value between the live in-person classes for the Spring 2020 semester and later terms for which students enrolled and paid, compared to the lesser online versions of classes that Defendant has been providing to them since mid-March 2020.

---

[1]      https://www.gwhatchet.com/2020/05/11/if-fall-classes-go-online-gw-should-explore-ways-to-cut-tuition/ (site last visited May 20, 2020).

[2] https://campusadvisories.gwu.edu/covid-19-frequently-asked-questions#continuity-courses.

## II.     JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds in the aggregate sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual Class members in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §§ 1332(d)(2) and (6). At least one member of the Class defined below is a citizen of a state other than the District of Columbia. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, Plaintiffs allege that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a jurisdiction other than the District of Columbia, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).[3]

10.     Venue is appropriate in this District because Defendants are located within the District of Columbia. On information and belief, events and transactions causing the claims herein, including Defendants' decision-making regarding any refund policy challenged in this lawsuit, has occurred within this judicial district.

---

[3] Less than 10% of students attending GW come from within the District of Columbia. https://www.collegefactual.com/colleges/george-washington-university/student-life/diversity/.

### III.   PARTIES

A.   **Plaintiffs**

11.     Plaintiff Mark Shaffer ("Plaintiff Shaffer") is a resident of the State of Pennsylvania. Plaintiff Shaffer is the parent of a current GW student and paid his daughter's tuition and fees for the Spring 2020 semester at GW.

12.     Plaintiff Margaret Mauldin ("Plaintiff Mauldin") is a resident of the State of Florida.  During the 2019-2020 academic year, Plaintiff Mauldin completed her first year of a Museum Studies graduate program at GW. She is expected to receive her Masters' degree in May 2021.

13.     Plaintiff Charafeddine Zaitoun ("Plaintiff Zaitoun") is a resident of Washington, D.C. He is an undergraduate student in his fourth year at GW and is expected to receive his Bachelors' degree in Real Estate in August 2020.

14.     Plaintiff Marc Lessin ("Plaintiff Lessin") is a resident of the State of Massachusetts. Plaintiff Lessin is the parent of a current GW student and paid his daughter's tuition and fees for the Spring 2020 semester at GW.

15.     Plaintiffs are in good financial standing at GW, having paid in whole or in combination tuition, fees, costs, assessed or demanded by Defendants for the Spring 2020 semester.

16.     While Plaintiffs and/or Plaintiffs' children could have pursued their degrees online in the first instance, they instead specifically selected an on-campus experience for the variety of educational and extracurricular opportunities and benefits that only an in-person program can provide.

17.     Plaintiffs thus contracted for and paid Defendants for on-campus instruction, opportunities, facilities, and services for the Spring 2020 semester.

18.     With GW's campus closure, cancellation of campus events, suspension of many campus services and programs, and transition to exclusively online instruction during the Spring 2020 semester, Plaintiffs and/or Plaintiffs' children lost access to the on-campus instruction, opportunities, facilities, and services for which Plaintiffs had bargained for by selecting—and paying tuition and fees for—in-person courses and experiences.

19.     For example, Plaintiffs and/or Plaintiffs' children lost use of vital access to campus libraries, as well as the ability to attend or participate in student-organizations, associated student activities, and student events.

20.     Additionally, with the transition to online-only classes, Plaintiffs and/or Plaintiffs' children noticed a significant decrease in the academic rigor of their courses. Plaintiffs paid GW for on-campus courses and the unique opportunities that come with them, including the ability to communicate directly with professors, utilize campus facilities and laboratories, attend office hours, and work through issues in-person. However, following the campus closure and transition to haphazard online courses, these benefits disappeared.

21.     Moreover, students faced significant delays associated with the shift from the bargained for in-person experience to online coursework, causing back loading of work and pushed-back deadlines. Such a transition also made it difficult for students to connect with professors and staff, a critical component to the bargained-for on-campus experience.

22.     The transition was challenging for GW faculty too, many of whom were unprepared to effectively use online educational delivery technology for both classwork and student interaction. As a result, while Plaintiffs and Class Members paid for students' in-person access to renowned faculty as a critical component of the GW experience, Defendants excluded students from such access for the full Spring 2020 semester.

-6-

**B.**     **Defendants**

23.     Defendant The George Washington University is an institution of higher learning located in Washington, D.C. During the 2020 Spring semester, Defendant provided Plaintiffs and Class Members with campus facilities, in-person classes, as well as a variety of other facilities for which it charged Plaintiff and the Class Members.

24.     Defendant Board of Trustees of George Washington University ("Board"), located at 825 21st Street, NW, Washington, DC 20006, is the governing body of GW, providing oversight of and having fiduciary responsibility for GW's academic, fiscal, and physical operations.[4]  The Board thus provides Plaintiffs members of the Class with campus facilities, in-person classes, as well as a variety of other facilities, services, and programs at GW and for which it charged Plaintiffs and members of the Class.

## IV.     FACTS

**A.**     **Background**

25.     Chartered in 1821, The George Washington University has gone on to become one of the nation's most prestigious universities, offering more than 75 programs of study across its 14 undergraduate and graduate schools.

26.     In the 2020 edition of U.S. News & World Report's Best Colleges, GW was ranked as the seventieth "Best National University."

27.     Across two campuses in Washington, DC—including its flagship "Foggy Bottom" campus—and an additional campus in Ashburn, Virginia, GW currently enrolls more than 12,500 undergraduate and more than 15,600 graduate students, and, altogether, serves a total of more than 28,100 students.

---

[4] https://trustees.gwu.edu/ (site last visited May 20, 2020).

28.     As of June 30, 2019, GW's endowment totaled approximately $1.779 billion and the university ended the fiscal year with assets totaling more than $4.748 billion. Defendants collected $774.143 million in student tuition and fees (net of $333,821 university funded scholarships)—a $21.2 million increase from the year before—with Defendants' total operating revenues totaling $1.546 billion.

29.     In July 2017, Defendants announced the final results of GW's largest ever fundraising campaign—"Making History: The Campaign for GW"—through which nearly 67,000 donors contributed more than $1.02 billion to the university. During the campaign, GW raised: (1) more than $177 million to support students, including 128 new endowments for student financial aid; (2) more than $626 million to enhance academics, including 23 new endowed faculty positions; (3) more than $163 million for facilities; and (4) an additional $57 million in unrestricted funds to address other university needs.

30.     All told, GW was recently recognized as one of the 60 richest universities in the country.[5]

31.     GW is also among the nation's most expensive private secondary educations. For the Spring 2020 semester, Defendants assessed the following for on-campus programs: between $25,875 and $29,275 (depending on when the student entered study) for undergraduate tuition, between $1,765 to 2,225 per credit (depending on the student's course of study) for graduate tuition, student association fees at $3.00 per credit hour, dining plans ranging from $1,525 to $2,375, and residence hall rates ranging from $4,675 to $8,420 (depending on the residence hall).

---

[5]  https://thebestschools.org/features/richest-universities-endowments-generosity-research/   (last   visited May 20, 2020).

32.     Defendants market GW and justify these high costs by touting the vitality of the campus experience, which comes with face-to-face interaction with renowned faculty, a wide array of in-person services, opportunities, and extra-curricular activities, state-of-the-art facilities, and much more.

33.     For example, GW advertises its Foggy Bottom Campus as combining "the academic and residential amenities of a top-notch university with the excitement and convenience of living in the heart of the city. From lecture halls to high tech labs, and small group meeting rooms to open study spaces, you'll find a wide range of learning environments to fit your needs and aspirations."[6]

34.     In highlighting its undergraduate programs, GW states:

> When you study at GW, your experience will be anything but typical. You might learn from Pulitzer Prize-winners, run into world leaders on campus or be challenged by the first lady to serve our community. But the real difference at GW is that as a student you'll immediately put what you learn into action. From the center of Washington, D.C., you'll be able to explore hundreds of internship opportunities (in your field alone), take part in groundbreaking research that changes lives, join a student organization and volunteer with fellow Colonials in the city or around the world. If you come to GW, you won't just live in D.C. — you'll become a part of the nation's capital and make a difference in it every day.[7]

35.     GW also highlights its campus life by stating: "During your time at GW, you'll likely find fellow Colonials who share your interests. Whether it's leadership, politics, arts and culture, athletics or service that moves you, GW students engage in more than 450 clubs and

---

[6] https://www.gwu.edu/foggy-bottom-campus.

[7] https://www.gwu.edu/undergraduate-admissions (site last visited May 20, 2020).

student organizations on campus. Pursuing your passions and sharing your diversity plays an

integral role in building our community."[8]

36.     Similarly, the Graduate School at GW also touts on-campus connections between

students and faculty:

> Whether you want to advance your current career or start on a fresh path,
> we're confident you will find what you're looking for at GW. With more than
> 240 graduate programs in our schools and colleges, there's a program here
> that will fit your interests and lifestyle. If you want to work in labs with
> researchers who are changing the world or take a metro ride to class after
> work to study with world-renowned faculty, GW offers the variety and
> flexibility to meet your needs. With our graduate education, the relationships
> you build with your fellow students and faculty members will become a
> network of Colonials you'll carry with you.[9]

37.     GW also notes that "learning goes well beyond attending lectures and writing

papers. Our schools and colleges provide a place for you to debate and discuss how to make a

difference in the world and then actually go do it. Your classmates, friends and professors will

motivate you to use what you're learning, as well as your skills, ideas and passions, to help

others and pave a path for your future."[10]

38.     Perhaps because it has long taken pride in, and marketed, its unique on-campus

academic experience, GW has been relatively hesitant to develop online courses and programs.

While many schools nationwide offer and highlight remote learning capabilities as a primary

component of their efforts to deliver educational value (*see, e.g.*, Western Governors University,

Southern New Hampshire University, University of Phoenix-Arizona), GW is not such a school.

---

[8] https://www.gwu.edu/campus-life. (site last visited May 20, 2020).

[9] https://www.gwu.edu/graduate-admissions (site last visited May 20, 2020).

[10] https://www.gwu.edu/schools-colleges.

39.     Instead, GW offers only a fraction of its courses and programs in an online or "hybrid" format. For example, while GW offers approximately fifty on-campus doctorate programs, only ten doctorate programs are available online. On the undergraduate side, GW offers seventy-five programs on-campus, but just nine online.

40.     For the online programs that it does offer, GW has admitted that online education is vastly different from instruction provided in-person. For example, a blog post titled, "What is an online class like?" on GW's Graduate School of Political Management explains that:

> There are several differentiating factors between on-campus and online master's degree programs. The divide between these two modes of education is somewhat similar to the differences between working in an office and telecommuting. While the overall purpose is the same, the execution is different, requiring more self-direction as well as adept use of communications tools like chat and email.[11]

41.     Not only are GW's pre-planned online programs limited and very different from their on-campus counterparts, their quality has previously been called into question. In 2016, four former online graduate students sued GW, alleging that their online courses did not live up to GW's promise that they would teach students "exactly what [they] would learn in a brick-and-mortar classroom."[12] *Bradford v. George Wash. Univ.*, 249 F.Supp.3d 325 (D.D.C. 2017). As reported by Inside Higher Ed:

> In addition to complaints about the content of the program, the students say the instructors were "consistently unresponsive," gave feedback that "demonstrated a lack of attention and participation" and would not log in to the online portal for "several weeks at a time." After being promised instructors who would "be actively involved in guiding and facilitating a student-centered education," the students say their instructors were "hardly involved at all."[13]

---

[11] https://gspm.online.gwu.edu/blog/what-is-an-online-class-like/, last visited July 10, 2020.

[12]     https://www.insidehighered.com/news/2016/04/15/george-washington-u-alumni-sue-university-over-quality-online-program, last visited July 10, 2020.

[13] *Id.*

42.     A GW Faculty Senate task force established in the lawsuit's aftermath found that the students' allegations were not unfounded. In fact, in its February 2017 report, the task force revealed a "lack of oversight, unclear course requirements and large student-faculty ratios" across GW's online programs.[14]

43.     Perhaps due to such concerns—that online courses are of lower quality than on-campus classes and/or provide students with less access to university facilities —colleges and universities often charge significantly discounted rates for the online courses and programs that they offer. For example, during the 2019-2020 academic year, for graduate students in GW's School of Engineering & Applied Science, Defendants assessed $1,965 per credit in tuition for on-campus students, and only $975 per credit for students in the "M.S. *(online)*" program.[15] On the undergraduate side, students enrolled in GW's Health Sciences programs—which are only offered online—were charged $615 per credit in tuition, or $11,070 for an 18-credit semester.[16] Meanwhile, during the Spring 2020 semester, their colleagues in GW's on-campus undergraduate programs paid between $25,875 and $29,275 in tuition.

**B.      Plaintiffs Contracted with Defendants for On-Campus Classes And Access To Facilities**

44.     Against this backdrop, for the Spring 2020 semester, Plaintiffs contracted with GW—and paid a premium—specifically for *on-campus* courses and programs and access to on-campus facilities.

---

[14]   https://www.insidehighered.com/digital-learning/article/2017/10/18/faculty-analysis-criticizes-online-education-george-washington, last visited July 10, 2020.

[15]https://studentaccounts.gwu.edu/sites/g/files/zaxdzs1311/f/downloads/Final%20SEAS%20FY20%20Tuition%20for%20SAO%20%281%29.pdf, last visited July 10, 2020.

[16]https://studentaccounts.gwu.edu/sites/g/files/zaxdzs1311/f/downloads/Final%20SMHS%20FY20%20Tuition%20for%20SAO%20%285%29.pdf, last visited July 10, 2020.

45.    GW's 2019-2020 University Bulletin ("Bulletin") lays out the terms of the contract between GW and Plaintiffs and class members, and, throughout, distinguishes between on-campus students and courses and their online counterparts.[17] *See* Exhibit A.[18]

46.    For example, the Bulletin establishes that "on-campus" students in both undergraduate and graduate programs have unique registration procedures and withdrawal refund schedules. *Id.* at 23, 31, 49, 1007. The Bulletin lays out different health insurance policies for on-campus and online students, requiring the former to carry student health insurance; in fact, on-campus students in these programs are automatically enrolled in the GW insurance plan, while their off-campus peers are not. *Id.* at 950. In addition, certain fees are unique to on-campus and online programs. For example, the Bulletin sets forth a $35 "special fee" only for "[r]egistration for off-campus and online programs." *Id.* at 48.

47.    In addition to these administrative differences between on-campus and online students, the Bulletin repeatedly explains, in reasonably certain terms, the differences in on-campus and online *courses*. As the Bulletin lays out, courses provided on-campus routinely offer students advantages and opportunities that are only available through on-campus, in-person instruction. For example, the Bulletin's descriptions for on-campus courses refer to: "[o]n-campus…presentations by leading practitioners" (*id.* at 1395); "on-campus group supervision" for practicums and clinicals (*id.* at 121); "[h]ands-on experiments and projects" (*id.* at 1263); "hands-on training" in workshops (*id.* at 1336); [h]ands-on laboratory experience using

---

[17] A final version of GW's 2019-2020 University Bulletin is not available in Defendants' online archive (*see* http://bulletin.gwu.edu/archives/). Accordingly, all references herein are to the Provisional version of the 2019-2020 Bulletin.

[18] The Bulletin is also available at http://bulletin.gwu.edu/pdf/2019-20.pdf, last visited July 15, 2020.

laboratory facilities" being an "integral part of th[e] course" (*id.* at 1400); and dozens of other references to benefits exclusive to on-campus instruction.

48.     Defendants' usual and customary practices when students register for on-campus courses and pay tuition for such courses is to provide on-campus instruction. Plaintiffs and Class members' reasonable expectation when registering for classes for the Spring 2020 was that those classes would be provided on-campus, consistent with Defendants' usual and customary practice.

49.     The combination of the express terms of the Bulletin and Defendants' usual and customary practice constituted an offer to any students attending GW to register for on-campus classes. If accepted by Plaintiffs and Class members who did in fact register for such on-campus classes (in accordance with GW's policies and procedures and usual custom and practice) and who timely paid tuition for those on-campus classes, Defendants became contractually obligated to provide on-campus classes to Plaintiffs and Class members.

50.     In light of the terms laid out in the Bulletin and Defendants' usual and customary practice, Plaintiff Mauldin registered for on-campus graduate courses for the Spring 2020 semester. Defendants accepted her registration as an on-campus student taking on-campus courses and charged Plaintiff Mauldin $14,895 in tuition, as well as a $27 Student Association Fee. After receiving an endowment scholarship, Plaintiff Mauldin paid $9,922 for her tuition and fees for the Spring 2020 semester.

51.     Plaintiff Mauldin selected GW for her graduate studies because of the networking and collaboration with professors and professionals offered through GW's on-campus program, including field trips to local museums and peer-reviewed classes. During the Spring 2020 semester, she also paid for an internship at the Smithsonian Museum. Mauldin contracted with Defendants and agreed to pay the high cost of GW's on-campus graduate tuition because the

program offered access to these and other opportunities that were based on in-person classes and study.

52.     In light of the terms laid out in the Bulletin and Defendants' usual and customary practice, Plaintiff Shaffer's daughter registered for on-campus graduate courses for the Spring 2020 semester. Defendants accepted her registration as an on-campus student taking on-campus courses and charged Plaintiff Shaffer $15,912 in tuition for the Spring 2020 semester, along with other fees.

53.     Plaintiff Shaffer's daughter selected, and Plaintiff Shaffer paid, GW for the in-class and educational experiences that only an in-person program can deliver, such as the ability to access important university facilities (e.g., GW's library system and special tools available only physically in the library or library computer systems), direct communication with professors, attend office hours, and work through issues in-person.

54.     Plaintiff Shaffer and/or Plaintiff Shaffer's daughter contracted with Defendants and agreed to pay the high cost of GW's on-campus graduate tuition because the program offered access to these and other opportunities that were based on in-person classes and study.

55.     In light of the terms laid out in the Bulletin and Defendants' usual and customary practice, Plaintiff Lessin's daughter also registered for on-campus undergraduate courses for the Spring 2020 semester. Defendants accepted her registration as an on-campus student taking on-campus courses and charged Plaintiff Lessin $27,570 in tuition for the Spring 2020 semester, along with other fees.

56.     Plaintiff Lessin's daughter selected, and Plaintiff Lessin paid, GW for the in-class and educational experiences that only an in-person program can deliver, and as an international

studies major, selected GW for its D.C. location and access to on-campus in-person experiences that accompany and benefit such studies in D.C.

57.     Plaintiff Lessin and/or Plaintiff Lessin's daughter contracted with Defendants and agreed to pay the high cost of GW's on-campus undergraduate tuition because the program offered access to these and other opportunities that were based on in-person classes and study.

58.     Similarly, Plaintiff Zaitoun registered for on-campus undergraduate courses for the Spring 2020 semester pursuant to the terms of the Bulletin and Defendants' usual and customary practice. Defendants accepted Plaintiff Zaitoun's registrations, charging Plaintiff Zaitoun $26,717.50 in tuition, as well as $96.25 in fees.

59.     Plaintiff Zaitoun selected GW and paid GW for the in-class and educational experiences that only an in-person program can deliver, such as the ability to access important university facilities (e.g., GW's library system and special tools available only physically in the library or library computer systems), direct communication with professors, attend office hours, and work through issues in-person.

60.     Plaintiffs and Class Members paid GW tuition and fees for on-campus courses—and the benefits, services, opportunities, and facilities that came with them—for the Spring 2020 semester. In registering and paying GW tuition and fees for the Spring 2020 semester, Plaintiffs and Class Members understood, per the Bulletin and GW's usual and customary practice, that the classes that they bargained and paid for would be administered on-campus for the duration of the semester, and that they would get a full semester's worth of access to on-campus facilities, services, and resources.[19]

---

[19] While the Bulletin states that "[GW] reserves the right to change courses, programs, fees, and the academic calendar, or to make other changes deemed necessary or desirable, giving advance notice of change when possible," Plaintiffs and Class Members reasonably understood this to mean that, although

61.     However, as set forth further below, since March 10, 2020, Plaintiffs and/or Plaintiffs' children have not been permitted to attend classes on-campus or had access to campus benefits.

**C.     The Novel Coronavirus Shutdowns And Defendants' Campus Closure**

62.     On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness. Days later, researchers in China identified a new virus that had infected dozens of people in Asia, subsequently identified and referred to as the novel coronavirus, or COVID-19.

63.     By January 21, 2020, officials in the United States were confirming the first known domestic infections of COVID-19.

64.     Due to an influx of thousands of new cases in China, on January 30, 2020, the World Health Organization officially declared COVID-19 as a "public health emergency of international concern."

65.     By March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

66.     Travel and assembly restrictions began domestically in the United States on March 16, 2020, with seven counties in the San Francisco, California area announcing shelter-in-place orders. Other states, counties, and municipalities have followed the shelter-in-place orders and as of April 6, 2020, 297 million people in at least 38 states, 48 counties, 14 cities, the District of Columbia, and Puerto Rico are being urged or directed to stay home.

---

specific classes might be canceled or campus events rescheduled, one thing would remain constant: Under their contract with Defendants, they would receive on-campus instruction and the core benefits that accompany it.

67.     On or about March 10, 2020, Defendant began closing its campus. That day, GW informed students that:

> [B]eginning Monday, March 23, most GW classes will move online, and they will remain online through at least April 5. The university will remain open and operational during this period, and all faculty and staff should maintain their regular work schedules. We will update you by March 27, if we will continue with remotely held classes beyond April 5.

68.     At this time, GW also suspended all in-person student organization activities and events. Additionally, GW effectively evicted the GW student-body from residence halls, noting: "After spring break, all residential students are expected to no longer be living in student housing as of March 21 until the end of the instructional continuity period . . . Students who do not apply to remain on campus will not have access to the residence halls after 5 p.m. on March 20."[20]

69.     On March 13, 2020, GW announced that it would be limiting access to campus buildings on March 14, 2020.[21]

70.     And by March 16, 2020, Defendant decided "to extend the virtual learning period through the end of the spring semester" and cancelled all on-campus events through the end of the semester.[22]

**D.     Defendants' Refusal To Issue Tuition And Fee Refunds**

71.     GW recognized that moving classes online presented problems. Defendants acknowledged that they can only offer "instructional continuity" during this "particularly stressful time" and that students should have pass/no pass grade options because "the

---

[20] https://campusadvisories.gwu.edu/covid-19-updates-president-leblanc.

[21] https://campusadvisories.gwu.edu/covid-19-update-limited-access-campus-buildings.

[22] https://campusadvisories.gwu.edu/important-covid-19-message-president-leblanc.

interruptions to our students' daily lives and the uncertainty the pandemic has cause have been unprecedented."

72.     The hasty conversion to "virtual learning" has not compared and cannot compare to the live classes and access to facilities bargained for and paid for by Plaintiffs and Class members and promised to be delivered by Defendants.

73.     Nor do the online classes offered by GW following Defendants' breach of the contract to provide on-campus learning compare to well-planned and executed online courses. As one in-depth article noted, "Well-planned online learning experiences are meaningfully different from courses offered online in response to a crisis or disaster."[23] GW's offerings are not – and cannot be, under the circumstances – "well-planned online learning experiences." Instead, GW professors were given instructional videos for "Online Teaching in 10 Minutes."[24]

74.     The result of this approach is that Plaintiffs and Class members have been provided with a second-rate online substitute for the hands-on, in-person coursework for which they contracted—and for which they paid. As further noted in the above-referenced article:

> Typical planning, preparation, and development time for a fully online university course is **six to nine months before the course is delivered**. Faculty are usually more comfortable teaching online by the second or third iteration of their online courses. **It will be impossible for every faculty member to suddenly become an expert in online teaching and learning in this current situation**, in which lead times range from a single day to a few weeks. While there are resources to which faculty can turn for assistance, the scale of change currently being required on many campuses will stress the systems that provide those resources and most likely will surpass their capacities. **Let's face it: many of the online learning experiences that instructors will be able to offer their students will not be fully featured or necessarily well planned, and there's a high probability for suboptimal**

---

[23]  https://er.educause.edu/articles/2020/3/the-difference-between-emergency-remote-teaching-and-online-learning (site last visited May 20, 2020).

[24]  https://campusadvisories.gwu.edu/resources-covid-19-virtual-learning-period (site last visited May 20, 2020).

**implementation**. We need to recognize that everyone will be doing the best they can, trying to take just the essentials with them as they make a mad dash during the emergency. Thus, **the distinction is important between the normal, everyday type of effective online instruction and that which we are doing in a hurry with bare minimum resources and scant time: emergency remote teaching.**[25]

75.     Yet despite providing students with only emergency and unplanned educational experiences that are vastly different from what Plaintiffs and Class members contracted and paid for, GW has refused to provide students with prorated reimbursements of tuition and fees. In fact, GW's Frequently Asked Questions (FAQ) page on its website claims that "As we continue to deliver quality education, the tuition charged remains the same regardless of format." [26]  In effect, Defendants have placed the entire financial burden of their emergency remote teaching program onto Plaintiffs and the Class.

76.     Even where well-planned online courses are offered, they generally cost less that live, in-person classes. This is true at GW, which "already offers a discount on its regular online course offerings – for the 2019–2020 academic year, the cost for some of these classes hovers at around $600 per credit, a far cry from the per-credit cost for undergraduates of $1,675. This discount reflects the fact that the quality of instruction is different between online and in-person instruction."[27]

77.     The remote, online learning "classes" offered to Spring 2020 students since March deprived students of in-person learning from their peers and school faculty.  The move to

---

[25]  https://er.educause.edu/articles/2020/3/the-difference-between-emergency-remote-teaching-and-online-learning (emphasis added) (site last visited May 20, 2020).

[26] https://financialaid.GW.edu/coronavirus (site last visited May 13, 2020).

[27]     https://www.gwhatchet.com/2020/05/11/if-fall-classes-go-online-gw-should-explore-ways-to-cut-tuition/ (site last visited May 20, 2020).

these remote classes also deprived students access to the facilities, materials, and opportunities only offered on GW's physical (as opposed to virtual) campus, including laboratory and research experience, use of on campus facilities (*e.g.*, the gym and libraries), and use of on campus services and events (*e.g.*, attending sporting events, end-of-year programs and events, and various student services).

78.    The online classes Plaintiffs and their peers have been provided are not equivalent to, and are worse than, the in-person, campus experience that Plaintiffs and other GW students chose for their university education.  The tuition and fees that Defendant charged were predicated on access to, constant interaction with, and feedback from peers, mentors, professors, and guest lecturers; access to technology, libraries, and laboratories; opportunities to attend or participate in spectator sports and athletic programs; access to student government and health services; and participation in extracurricular groups and learning, among other things.

79.    The online classes offered to Plaintiffs and their peers are also of substantially lower quality and are objectively worth less than the in-person courses for which they enrolled and paid.

80.    GW's post-COVID-19 online student offerings do not even come close to comparing with either GW's in-person course experiences. Instead, Plaintiffs and Class members have been forced into overpriced bubble-gum-and-duct-tape substitutes. Yet, despite offering students inferior, poorly planned, and poorly executed online courses, Defendant refuses to issue refunds to Plaintiffs and thousands of other students.

81.    As a result of the closure of GW, Defendants have not delivered the educational services, facilities, programs, and opportunities for which Plaintiffs and the Class contracted and paid.  "[S]tudents have had to shoulder GW's high tuition cost for an unanticipated period of

lower-quality instruction."[28] Plaintiffs and the proposed Class are therefore entitled to a full refund of the portion of the fees and tuition for the latter half of the Spring 2020 semester that Defendants did not provide, or which it provided in a severely diminished manner such that Defendants' breached the contract to provide Plaintiffs and Class members with on-campus classes and access to facilities.

82.     Indeed, college students across the country have offered apt descriptions of the loss they have experienced as a result of the pandemic, highlighting the disparity between students' bargained for educational experience and the experience that colleges and universities, including Defendant, provided for the second half of the Spring 2020 semester.

83.     For example, as reported in The Washington Post, one student "wonders why he and others . . . are not getting at least a partial tuition refund. Their education, as this school year ends in the shadow of a deadly pandemic, is nothing like the immersive academic and social experience students imagined when they enrolled. But tuition remains the same: $27,675 per semester . . . 'Our faculty are doing a good job of working with us,' said Patel, 22, who is from New Jersey. 'But at the end of the day, it's not the same as in-person learning . . .  It shouldn't just be a part of the business model where, no matter what happens, you have to pay the same amount. The cost needs to reflect some of the realities.'"[29]

84.     Thousands of GW students feel similarly, with over 2,000 signing a Change.org petition seeking a partial refund of Spring 2020 semester tuition, noting the following:

> "GW has transitioned to online classes and is not letting students
> return to campus. Due to classes being online, GW needs to give a
> partial refund to all students. Students pay to attend in-person

---

[28] *Id.*

[29]     https://www.washingtonpost.com/education/2020/04/16/college-students-are-rebelling-against-full-tuition-after-classes-move-online/.

classes, not online ones. If students wanted to attend online classes, they could have chosen to do so somewhere else for cheaper.

Many students cannot properly learn in this environment and some professors are not even holding any sort of class. Some professors have told us to essentially self-learn the material and just reach out for questions. What are we paying for? If we wanted to teach ourselves, we would not be attending GWU.

In the wake of COVID-19, GW should be sympathetic to students and families. Many students and families of students are struggling with unemployment and other stressors. GW needs to be sensitive to this.

MOST IMPORTANTLY, it is not fair or ethical to keep full tuition when the promised service is not being provided. Students pay the full amount of their tuition to attend in-person classes to succeed and learn hands-on. Online classes do not provide the same experience. GW is not holding up their end of the deal when it comes to providing education; therefore, we should not be paying our full tuition."[30]

85.    And as reported in *The GW Hatchet* student newspaper:

Samim, the petition's creator, said in an interview that she created the petition because it's "really unfair" for officials to charge students the full cost of tuition while classes are held virtually when online schools throughout the country cost "way less."

"What are we paying for if we're not getting that?" she said about online classes. "We're just paying to have Zoom. Some professors, they're not even doing Zoom, they're doing like, teach yourself basically with these slides. And if I'm teaching myself, what am I paying for?"

Samim said she is not surprised by the number of signatures the petition has garnered, adding that officials should acknowledge the petition's support and partially refund tuition as they have with other student expenses, like housing and dining.

"I just want them to address it because I think they're also aware that this is an issue, and the fact they haven't addressed it is shady to me," she said. "Because I'm like, 'You guys don't want to put

---

[30] https://www.change.org/p/george-washington-university-gw-needs-to-refund-half-of-the-tuition-for-all-gw-students, last visited July 10, 2020.

ideas in people's heads.' Is that why you're not seeing it? What's going on?"[31]

86.     Given Defendants' transition to online classes and COVID-19 concerns, Defendants asked students to vacate student housing as soon as possible and no later than March 20, 2020. Acknowledging that, as a result, GW students would not get what they had bargained for in contracting for on-campus housing and meal plans, Defendants agreed to prorate housing and dining as of March 20, 2020.

87.     However, despite the fact that GW students also would not get what they had bargained for in contracting for on-campus courses, opportunities, facilities, and resources, Defendants have inexplicably refused to refund Plaintiffs and Class Members any of the tuition or mandatory fees they had paid for the Spring 2020 semester.

88.     This denial of tuition refunds was reported in *The GW Hatchet*, confirming "officials have said they do not plan to refund tuition dollars."[32]

89.     GW has admitted that it has not provided what Plaintiffs and Class members bargained and paid for, acknowledging that online classes were "not how our students expected to complete their classes this spring."[33]

90.     GW's refusal to refund tuition or fees to students remains, notwithstanding the fact that it is eligible to receive $9,118,529 in aid under the federal stimulus bill.[34]

---

[31]     https://www.gwhatchet.com/2020/03/29/more-than-1200-people-sign-petition-urging-officials-to-refund-half-of-spring-tuition/.

[32] https://www.gwhatchet.com/2020/04/13/how-gws-covid-19-response-stacks-up-with-its-peers/.

[33] https://campusadvisories.gwu.edu/covid-19-frequently-asked-questions#continuity-courses.

[34]     https://edsource.org/2020/searchable-database-how-much-will-california-colleges-get-in-emergency-stimulus-funds/628749

## V.      CLASS ACTION ALLEGATIONS

91.      Plaintiffs sue under Rule 23(a), (b)(5), and Rule 23(b)(3) of the Federal Rules of

Civil Procedure, on behalf of themselves and a Class defined as follows:

> All people paying Defendants, in whole or in part, personally
> and/or on behalf of others, for tuition, fees, and/or room board for
> in-person instruction and use of campus facilities, but who were
> denied use of and/or access to in-person instruction and/or campus
> facilities by Defendants.

Excluded from the Class are Defendants, any entity in which Defendants have a controlling

interest, and Defendants' legal representatives, predecessors, successors, assigns, and employees.

Further excluded from the Class is this Court and its employees. Plaintiffs reserve the right to

modify or amend the Class definition including through the creation of sub-classes if necessary,

as appropriate, during this litigation.

92.      The definition of the Class is unambiguous. Plaintiffs are members of the Class

Plaintiffs seek to represent. Class Members can be notified of the class action through contact

information and/or address lists maintained in the usual course of business by Defendants.

93.      Per Rule 23(a)(1), Class Members are so numerous and geographically dispersed

that the individual joinder of all Class Members is impracticable. The precise number of Class

members is unknown to Plaintiffs but may be ascertained from Defendants' records; however,

given the thousands of students enrolled at GW in a given year, that number greatly exceeds the

number to make joinder possible. Class Members may be notified of the pendency of this action

by recognized, Court-approved notice dissemination methods, which may include U.S. Mail,

electronic mail, Internet postings, and/or published notice.

94.      Defendants have acted or refused to act on grounds generally applicable to

Plaintiff sand the Class Members, making appropriate final injunctive relief and declaratory

relief regarding the Class under Rule 23(b)(2).

95.     Consistent with Rule 23(a)(2), Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class Members. Similar or identical legal violations are involved. Individual questions pale by comparison to the numerous common questions that predominate. The injuries sustained by the Class Members flow, in each instance, from a common nucleus of operative facts—GW's campus closure and student evictions, its complete transition to online classes, and Defendants' refusal to refund tuition, fees, and/or room and board.

96.     Additionally, common questions of law and fact predominate over the questions affecting only individual Class Members under Rule 23(a)(2) and Rule 23(b)(3). Some of the common legal and factual questions include:

a.      Whether Defendants engaged in the conduct alleged;

b.      Whether Defendants have a policy and/or procedure of denying refunds, in whole or in part, to Plaintiffs and the Class Members;

c.      Whether Defendants breached identical contracts with Plaintiffs and the Class Members;

d.      Whether Defendants violated the common law of unjust enrichment;

e.      Whether Defendants converted Plaintiff and the Class Members refunds and/or rights to refunds; and

f.      The nature and extent of damages and other remedies to which the conduct of Defendants entitles the Class Members.

97.     The Class Members have been damaged by Defendants through their breach of contract, unjust retention of benefits conferred by Class Members, conversion of Class Members' funds, and denial of refunds to Class Members.

98.     Plaintiffs' claims are typical of the claims of the other Class Members under Rule 23(a)(3). Plaintiffs are students or the parents of a students enrolled at GW in the Spring 2020 term. Like other Class Members, Plaintiffs and Plaintiffs' children were instructed to leave Defendants' campuses, forced to take online classes, and have been completely or partially denied a refund for tuition, fees, and/or room and board.

99.     Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class as required by Rule 23(a)(4). Plaintiffs are familiar with the basic facts that form the bases of the Class Members' claims. Plaintiffs' interests do not conflict with the interests of the other Class Members they seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex class actions, including consumer protection class actions. Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class Members.

100.    The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class Members under Rule 23(b)(3). The relief sought per individual members of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants. It would be virtually impossible for the Class Members to seek redress individually. Even if the Class Members themselves could afford such individual litigation, the court system could not.

101.    In addition, under Rule 23(b)(3)(A), individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and

-27-

provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

102.    Under Rule 23(b)(3)(C), it is desirable to concentrate the litigation of the claims of Plaintiffs and the Class Members in this forum given that Defendants are located within this judicial district and discovery of relevant evidence will occur within this district.

103.    Given the similar nature of the Class Members' claims and the absence of material differences in the state statutes and common laws upon which the Class Members' claims are based, a nationwide Class will be easily managed by the Court and the parties per Rule 23(b)(3)(D).

## VI.    CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT

104.    Plaintiffs restate and re-allege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein.

105.    Plaintiffs and the Class Members entered into identical, binding contracts with Defendants by accepting Defendants' offer to register for on-campus classes in accordance with the terms of the Bulletin and Defendants' usual and customary practice of providing on-campus courses.

106.    The contracts clearly distinguished between on-campus courses and online courses, with each having, *inter alia*, different registration and withdrawal procedures, fees, and requirements.

107.    It was the reasonable expectation of Plaintiffs and Class Members and Defendants that Defendants would provide on-campus, as opposed to online, classes and instruction, and use of Defendants' facilities, in accordance with Defendants' usual and customary practice of

-28-

providing on-campus courses, and as provided in Defendants' publications, including but not limited the Bulletin, policies, procedures, brochures, advertisements, and other published materials.

108.    Under their contracts with Defendants, and Defendants' usual and customary practice of providing on-campus courses, Plaintiffs and the members of the Class registered for on-campus courses and paid Defendants tuition, fees, and/or room and board charges for Defendants to provide in-person instruction, access to Defendant's facilities, and/or housing services.

109.    A material term of the bargain and contractual relationship, whether express or implied, was that Defendants would provide on-campus courses and access on-campus facilities and services. Plaintiffs and the Class Members have fulfilled all requirements of their contracts, having followed the Bulletin's policies, procedures, and requirements for registering and paying for on-campus courses and access to on-campus facilities and services. Plaintiffs and the Class Members have paid Defendants for all Spring 2020 term financial assessments.

110.    However, Defendants have breached such contracts, failed to provide those on-campus classes and/or services, and have not otherwise performed as required by the contracts between Plaintiffs and the Class Members and Defendants. Defendants moved all classes to online classes, restricted or eliminated Class Members' ability to access university facilities, and/or evicted Plaintiffs and the Class Members from campus housing. In doing so, Defendants have deprived and continue to deprive Plaintiffs and the Class Members from the benefit of their bargains with Defendants.

111.     Plaintiffs and the Class Members have been damaged as a direct and proximate result of Defendant's breach. The online classes provided by Defendants are objectively different from, worse than, and less valuable than the on-campus classes for which the parties contracted.

112.     Plaintiffs and Class Members are entitled to damages, including but not limited to tuition refunds, fee refunds and/or room and board refunds.

## COUNT II

## BREACH OF IMPLIED CONTRACT

113.     Plaintiffs restate and re allege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein.

114.     Plaintiffs plead this Count in the alternative to Count I.

115.     Plaintiffs and the Class Members entered into an implied contract by accepting Defendants' offer to register for on-campus classes and use of Defendants' facilities in accordance with Defendants' usual and customary practice of providing on-campus courses.

116.     Under the implied contract, Plaintiffs and Class Members registered for on-campus courses.

117.     It was the reasonable expectation of Plaintiffs and Class Members that Defendants would provide them with on-campus, as opposed to online, classes and instruction and use of Defendants' facilities in accordance with Defendants' usual and customary practice of providing on-campus courses.

118.     Plaintiffs and Class Members accepted and intended to use and enjoy Defendants' on-campus classes and facilities.

119.     Plaintiffs and the Class Members have fulfilled all expectations by registering and paying for on-campus courses and access to on-campus facilities and services. Plaintiffs and the Class Members have paid Defendants for all Spring 2020 term financial assessments.

120.     However, Defendants breached the implied contract, failed to provide those on-campus classes and/or services, and have not otherwise performed as required by the implied-in-fact contract between Plaintiff and the Class Members and Defendants. Defendants moved all classes to online classes, restricted or eliminated Class Members' ability to access university

-31-

facilities, and/or evicted Plaintiffs and the Class Members from campus housing. In doing so, Defendants have deprived and continue to deprive Plaintiffs and the Class Members from the benefit of their bargains with Defendants.

121.    Plaintiffs and the Class Members have been damaged as a direct and proximate result of Defendants' breach. The online classes provided by Defendants are objectively different from, worse than, and less valuable than the on-campus classes for which the parties entered into an implied-in-fact contract.

107.    Plaintiffs and Class Members are entitled to damages, including but not limited to tuition refunds, fee refunds and/or room and board refunds.

**COUNT III**

**UNJUST ENRICHMENT**

122.    Plaintiffs restate and re-allege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein.

123.    Plaintiffs plead this Count in the alternative to Counts I and II.

124.    To the extent Defendants contend that the Bulletin permits them to unilaterally and without notice change the terms under which Plaintiffs and Class members were to receive instruction, from on-campus to online, the promises made by Defendants to Plaintiffs and Class Members to provide on-campus instruction were illusory and no contract exists between the parties.

125.    At all times relevant hereto, Plaintiffs and the Class Members directly conferred non-gratuitous benefits on Defendants, *i.e.*, monetary payments for tuition, fees, and/or room and board, so that students could avail themselves of in-person educational opportunities and utilize campus facilities, including campus dormitories.

126.    Defendants knowingly accepted the benefits conferred upon them by Plaintiffs and the Class Members.

127.    Defendants appreciated or knew of the non-gratuitous benefits conferred upon them by Plaintiffs and members of the Class.

128.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Class, with full knowledge and awareness that it would be unjust and inequitable to retain the benefit provided by Plaintiffs and Class Members for in-person instruction, access to Defendants' facilities, and housing services, because Defendants moved all classes online, restricted or eliminated Plaintiffs and Class Members' ability to access university facilities, and/or evicted Plaintiffs and the Class Members from campus housing.

129.    Due to Defendants' unjust and inequitable actions, Plaintiffs and members of the Class are entitled to refunds for tuition, fees, and/or room and board.

130.    Defendants knew Plaintiffs and/or Plaintiffs' children enrolled at GW and paid Defendants non-gratuitous benefits for a comprehensive academic experience, including in-person classes, opportunities to network with students and professors in-person, access to campus buildings and dormitories, and to avail themselves of school programs and events.

131.    However, Defendants provided Plaintiffs and/or Plaintiffs' children and Class Members something far less comprehensive: a limited online experience presented by Google or Zoom, void of face-to-face faculty and peer interaction, separated from program resources, and barred from facilities vital to study.

132.    Although Defendants sent students home, closed its residence halls, and offered an academic experience that was subpar in every respect, Defendants knowingly, inequitably,

and unjustly retained the non-gratuitous benefit of millions of dollars from students and parents in the form of tuition, fees, and room and board payments as if nothing had changed.

133.    Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

134.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Class are entitled to and seek disgorgement and restitution of the benefits unjustly retained, whether in whole or in part, including through refunds for tuition, fees, and/or room and board

**COUNT IV**

**CONVERSION**

135.    Plaintiffs restate and re-allege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein.

136.    Plaintiffs and the other members of the Class have an undisputed right to receive in-person educational services, activities, and access Defendants' facilities for the Spring 2020 term. Plaintiffs and the Class Members obtained such rights by paying Defendants tuition, fees, and/or room and board and by otherwise remaining in good standing with Defendants.

137.    Defendants wrongfully exercised control over and/or intentionally interfered with the rights of Plaintiffs and members of the Class by effectively closing its campus to in-person education and switching to an online-only format, discontinuing paid-for services, and evicting students from campus housing. All the while, Defendants have unlawfully retained the monies Plaintiffs and the Class Members paid Defendants as well as barred Plaintiffs from Defendants' facilities.

010920-14/1260664 V1

138.    Defendants deprived Plaintiffs and the other Class Members of the rights and benefits for which they paid Defendants tuition, fees, and/or room and board.

139.    Plaintiffs and/or Class Members have requested and/or demanded that Defendants issue refunds.

140.    Defendants' interference with the rights and services for which Plaintiffs and members of the Class paid damaged Plaintiffs and the members of the Class, in that they paid for rights, benefits, services, and/or facility access, but Defendants have deprived Plaintiffs and members of the Class of their rights, benefits, services, and/or facility access.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members request that the Court enter an order or judgment against Defendants including:

A.    Certification of the action as a Class Action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.    Damages in the amount of unrefunded tuition, fees, and/or room and board;

C.    Actual damages and all such other relief as provided under the law;

D.    Pre-judgment and post-judgment interest on such monetary relief;

E.    Other appropriate injunctive relief as permitted by law or equity, including an order enjoining Defendants from retaining refunds for tuition, fees, and/or room and board;

F.    The costs of bringing this suit, including reasonable attorney's fees; and

G.    All other relief to which Plaintiffs and members of the Class may be entitled by law or in equity.

## JURY DEMAND

Plaintiffs demand trial by jury on their own behalf and on behalf of Class Members.

-35-

Dated: July 15, 2020                    Respectfully submitted,

                                        By:  _/s/ *Andrew S. Levetown*_____
                                        Glenn Ivey (Bar No. 414331)
                                        Andrew S. Levetown (Bar No. 422714)
                                        IVEY & LEVETOWN, LLP
                                        6411 Ivy Lane, Suite 304
                                        Greenbelt, MD 20770
                                        (703) 618-2264
                                        ivey@iveylevetown.com
                                        asl@iveylevetown.com

                                        Steve W. Berman (*Pro Hac Vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA 98101
                                        (206) 623-7292
                                        steve@hbsslaw.com

                                        Daniel J. Kurowski (*Pro Hac Vice*)
                                        Whitney K. Siehl (*Pro Hac Vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        455 N. Cityfront Plaza Dr., Suite 2410
                                        Chicago, IL 60611
                                        (708) 628-4949
                                        dank@hbsslaw.com
                                        whitneys@hbsslaw.com

                                        Daniel J. Walker (Bar No. 219439)
                                        BERGER MONTAGUE PC
                                        2001 Pennsylvania Avenue, NW
                                        Suite 300
                                        Washington, DC  20006
                                        Tel: (202) 559-9745
                                        Email: dwalker@bm.net

                                        Shanon J. Carson (*Pro Hac Vice Forthcoming*)
                                        Glen L. Abramson(*Pro Hac Vice*)
                                        BERGER MONTAGUE PC
                                        1818 Market Street, Suite 3600
                                        Philadelphia, PA 19103
                                        Tel: (215) 875-3000
                                        Email: scarson@bm.net
                                        Email:  gabramson@bm.net

-36-

E. Michelle Drake (*Pro Hac Vice*)
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Email: emdrake@bm.net

*Attorneys for Plaintiffs, individually and on behalf*
*of all others similarly situated*

-37-

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on July 15, 2020, a true and correct copy of the foregoing, together with all exhibits referenced herein, was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

By: _/s/ *Andrew S. Levetown*_____
Andrew S. Levetown