### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARK SHAFFER, MARGARET MAULDIN, CHARAFEDDINE ZAITOUN, and MARK LESSIN, individually and on behalf of others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civ. Action No. 1:20-cv-01145-RJL |
| v. | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| THE GEORGE WASHINGTON UNIVERSITY and THE BOARD OF TRUSTEES OF GEORGE WASHINGTON UNIVERSITY, | ) ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANTS' MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants respectfully move this Court to dismiss the Consolidated Complaint filed by Plaintiffs, individually and on behalf of others similarly situated, in the above-captioned matter in its entirety. As set forth in the accompanying Memorandum of Law, Plaintiffs failed to state a claim upon which relief can be granted. All of Plaintiffs' claims—for breach of express and implied contract, unjust enrichment, and conversion—turn on the allegation that GW failed to provide its students the education promised when the University transitioned to remote learning. Plaintiffs' contract claims fail because they identify no certain, enforceable promise to provide an entire semester of in-person instruction that GW breached, let alone anything linking such a promise to tuition or fees. To the contrary, GW's agreements with its students make clear that fees are nonrefundable and that tuition is not refundable based on how students are taught or their satisfaction with their courses. Plaintiffs' unjust enrichment and conversion claims suffer

from similar threshold deficiencies, not least that they are unavailable to a party who sues on an enforceable contract.  These clearly established legal principles require dismissal of the complaint.  WHEREFORE, for the reasons set forth in the accompanying Memorandum of Law in Support of Defendants' Motion to Dismiss, Defendants respectfully request that this Court dismiss the Plaintiffs' Consolidated Complaint with prejudice.

Dated: August 12, 2020                    Respectfully submitted,

                                          */s/ Jamie S. Gorelick*
                                          Jamie S. Gorelick (#913384)
                                          Bruce M. Berman (#333948)
                                          Danielle Y. Conley (#503348)
                                          WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                          1875 Pennsylvania Avenue NW
                                          Washington, DC 20006
                                          Tel.: (202) 663-6006
                                          jamie.gorelick@wilmerhale.com
                                          bruce.berman@wilmerhale.com
                                          danielle.conley@wilmerhale.com

                                          Alan E. Schoenfeld (*pro hac vice* forthcoming)
                                          WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                          7 World Trade Center
                                          250 Greenwich Street
                                          New York, NY 10007
                                          Tel.: (212) 937-7294
                                          alan.schoenfeld@wilmerhale.com

                                          *Attorneys for Defendants The George Washington University and The Board of Trustees of the George Washington University*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARK SHAFFER, MARGARET MAULDIN, CHARAFEDDINE ZAITOUN, and MARK LESSIN, individually and on behalf of others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) Civ. Action No. 1:20-cv-01145-RJL ) ) **ORAL ARGUMENT REQUESTED** |
| v. | ) ) |
| THE GEORGE WASHINGTON UNIVERSITY and THE BOARD OF TRUSTEES OF GEORGE WASHINGTON UNIVERSITY, | ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

STATEMENT OF THE CASE .................................................................................. 2

LEGAL STANDARD ............................................................................................... 5

ARGUMENT ............................................................................................................ 5

I.      Plaintiffs' Claims For Breach Of Contract Should Be Dismissed.................................. 5

   A.      Plaintiffs Have Failed To Plead An Enforceable Contractual Obligation .................. 6

      1.      The University Bulletin Does Not Promise In-Person Instruction........................ 8

      2.      "Customary Practice" Does Not Create A Contractual Obligation..................... 10

   B.      Plaintiffs Have Failed To Allege Any Breach Of The Contract's Clear Terms ........ 11

   C.      D.C. Law Counsels Against Second-Guessing Educational Judgments.................. 14

II.     Plaintiffs' Other Causes Of Action Also Should Be Dismissed.................................. 18

   A.      Plaintiffs Fail To State A Claim For Unjust Enrichment......................................... 18

   B.      Plaintiffs Fail To State A Claim For Conversion.................................................... 22

III.    Plaintiffs' Complaint Should Be Dismissed With Prejudice ......................................... 24

CONCLUSION....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) .................................................................................. 18

*Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*,
  885 F. Supp. 2d 156 (D.D.C. 2012) ...................................................................... 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 5

*Atria v. Vanderbilt Univ.*,
  142 F. App'x 246 (6th Cir. 2005) ........................................................................... 15

*Bakeir v. Cap. City Mortg. Corp.*,
  2011 WL 13244122 (D.D.C. Dec. 28, 2011) .......................................................... 20

*Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
  130 F. Supp. 3d 236 (D.D.C. 2015) ...................................................................22, 23

*Coburn v. Evercore Tr. Co., N.A.*,
  844 F.3d 965 (D.C. Cir. 2016) ................................................................................. 5

*Davis v. Joseph J Magnolia, Inc.*,
  640 F. Supp. 2d 38 (D.D.C. 2009) ......................................................................... 19

*Doe v. Univ. of the South*,
  687 F. Supp. 2d 744 (E.D. Tenn. 2009) .................................................................. 13

*Edwards v. Ocwen Loan Servicing, LLC*,
  24 F. Supp. 3d 21 (D.D.C. 2014) ........................................................................... 23

*Hinson ex rel. N.H. v. Merritt Educ. Ctr.*,
  521 F. Supp. 2d 22 (D.D.C. 2007) ........................................................................... 5

*Itek Corp. v. First Nat'l Bank of Boston*,
  566 F. Supp. 1210 (D. Mass. 1983) ....................................................................... 10

*Martin v. United Airlines, Inc.*,
  727 F. App'x 459 (10th Cir. 2018) ......................................................................... 11

*Mauldin v. Board of Trustees of the George Washington University*,
  No. 20-cv-1417 (D.D.C.) ......................................................................................... 4

*McClean v. Duke Univ.*,
 376 F. Supp. 3d 585 (M.D.N.C. 2019) ............................................................ 16

*McNamara v. Picken*,
 950 F. Supp. 2d 193 (D.D.C. 2013) ................................................................ 23

*Mosby-Nickens v. Howard Univ.*,
 864 F. Supp. 2d 93 (D.D.C. 2012) ..........................................................*passim*

*Richter v. Catholic Univ. of Am.*,
 2019 WL 481643 (D.D.C. Feb. 7, 2019) ........................................................ 15

*Roe v. Saint Louis Univ.*,
 2012 WL 6757558 (E.D. Mo. Dec. 31, 2012)............................................15, 16

*Roebling v. Dillon*,
 288 F.2d 386 (D.C. Cir. 1961)........................................................................ 21

*Shaffer v. George Washington University*,
 No. 20-cv-1145 (D.D.C.) ................................................................................. 4

*Shatteen v. Omni Hotels Mgm't Corp.*,
 113 F. Supp. 3d 176 (D.D.C. 2015) ................................................................ 19

*Shinabargar v. Bd. of Trustees of Univ. of Dist. of Columbia*,
 164 F. Supp. 3d 1 (D.D.C. 2016) ..................................................................... 7

*Shulman v. Voyou, LLC*,
 251 F. Supp. 2d 166 (D.D.C. 2003) ................................................................ 24

*Stevens v. Sodexo, Inc.*,
 846 F. Supp. 2d 119 (D.D.C. 2012) .................................................................. 6

*Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car of Md.*,
 1989 WL 39393 (D.D.C. 1989)........................................................................ 20

*Vince v. Mabus*,
 956 F. Supp. 2d 83 (D.D.C. 2013) .................................................................. 25

**State Cases**

*Alden v. Georgetown Univ.*,
 734 A.2d 1103 (D.C. 1999)............................................................................. 14

*Allworth v. Howard Univ.*,
 890 A.2d 194 (D.C. 2006)..........................................................................14, 15

*André v. Pace Univ.*,
 655 N.Y.S.2d 777 (N.Y. App. Div. 1996) ...................................................... 15

*Basch v. George Washington Univ.*,
    370 A.2d 1364 (D.C. 1977)................................................................................*passim*

*Beukas v. Bd. of Trs. of Farleigh Dickinson Univ.*,
    605 A.2d 708 (N.J. Super. Ct. 1992) ................................................................ 12

*Brantley v. Dist. of Columbia*,
    640 A.2d 181 (D.C. 1994)................................................................................ 14

*Choharis v. State Farm Fire & Cas. Co.*,
    961 A.2d 1080 (D.C. 2008) ............................................................................. 23

*Eisele v. Ayers*,
    381 N.E.2d 21 (Ill. App. Ct. 1978)................................................................. 12

*Falconi-Sachs v. LPF Senate Square, LLC*,
    142 A.3d 550 (D.C. 2016) ............................................................................... 20

*Howard Univ. v. Best*,
    484 A.2d 958 (D.C. 1984)............................................................................... 10

*Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*,
    870 A.2d 58 (D.C. 2005)............................................................................20, 21

*Jung v. George Washington Univ.*,
    875 A.2d 95 (D.C. 2005)................................................................................. 22

*Lucero v. Curators of Univ. of Mo.*,
    400 S.W.3d 1 (Mo. Ct. App. 2013)................................................................. 15

*Moss v. Wayne State Univ.*,
    2009 WL 4344193 (Mich. Ct. App. Dec. 1, 2009)......................................... 21

*Paynter v. New York University*,
    319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ...................................................... 16

*Schiff v. AARP*,
    697 A.2d 1193 (D.C. 1997)............................................................................. 18

*Varner v. District of Columbia*,
    891 A.2d 260 (D.C. 2006)................................................................................. 8

## INTRODUCTION

In the face of an unprecedented public health crisis, the George Washington University (together with its Board of Trustees, "GW" or the "University") worked to protect its students and staff and to provide continuity in its two-century tradition of excellence in education. In a few short weeks, the University set up a comprehensive remote learning environment that allowed students and faculty to complete their semester without unduly risking their health and well-being. Transitioning students to virtual learning that meets GW's academic standards took tremendous effort and resources and required a deliberate application of the University's professional educational judgment.

This case is one of roughly 150 lawsuits brought against colleges and universities challenging the schools' responses to COVID-19. In a consolidated amended complaint, Plaintiffs—two current GW students and two parents of current GW students—concede that the University had no choice but to discontinue in-person teaching and the residential experience due to the pandemic and related District of Columbia governmental orders. Still, they contend that they obtained less than they bargained for when they chose to enroll themselves or their children. The core of this case—and all these cases—is that when colleges and universities transitioned to remote learning during the second half of the Spring 2020 semester, the value and quality of the education they provided was diminished, and students are entitled to a refund of tuition and fees as a result. GW stands firmly behind the decisions it made in the face of the pandemic to protect its students' health and well-being and to continue its students' education under uniquely complex and challenging circumstances. GW is also firm in its judgment that it provided high quality educational services during the entire Spring 2020 semester, and that no refund of tuition and fees is owed to Plaintiffs.

While the circumstances confronting GW and other schools as a result of the pandemic are unprecedented, this case should be dismissed under settled legal principles. All of Plaintiffs' claims—for breach of express and implied contract, unjust enrichment, and conversion—turn on the allegation that GW failed to provide its students the education promised when the University transitioned to remote learning. Plaintiffs' contract claims fail because they identify no certain, enforceable promise to provide an entire semester of in-person instruction that GW breached, let alone anything linking such a promise to tuition or fees. To the contrary, GW's agreements with its students make clear that fees are nonrefundable and that tuition is not refundable based on how students are taught or their satisfaction with their courses. Plaintiffs' unjust enrichment and conversion claims suffer from similar threshold deficiencies, not least that they are unavailable to a party who sues on an enforceable contract. These clearly established legal principles require dismissal of the complaint.

Indeed, they carry special weight in this case because decades of D.C. law establish that challenges to how universities offer instruction and grant degrees are not justiciable. There is no way to avoid those decisions here: Plaintiffs' claims would require this Court to assess what quality of education GW promised, what quality it delivered, and what dollar figure to assign any difference. Settled D.C. law provides that those are not questions this Court—or a jury—may answer. Thus, this case should be dismissed with prejudice.

## STATEMENT OF THE CASE

This lawsuit involves GW's response to the public health crisis created by COVID-19. In early March, the novel coronavirus began to spread rapidly across the United States and the first

case of COVID-19 was confirmed in Washington, D.C.[1]  On March 10, GW announced that, beginning on March 23, in-person classes would temporarily shift to remote instruction to protect the health and well-being of students, faculty, and staff, but also to ensure continuity of instruction for all enrolled students.  *See* Dkt. 17, Consolidated Complaint ("Compl.") ¶ 67. Then the crisis escalated.  The next day, March 11, the World Health Organization declared COVID-19 a pandemic,[2] Mayor Muriel Bowser declared a state of emergency in the District of Columbia,[3] and the D.C. Department of Health recommended that non-essential mass gatherings be postponed or cancelled.[4]  Travel and assembly restrictions were rapidly implemented around the country.  On March 16, the University announced that remote learning would continue for the remaining 26 days of instruction in the Spring 2020 semester.  *See id.* ¶ 70.  GW required most students to vacate residence halls to lower population density on campus and fight the spread of the virus,[5] but the University continued to provide services to students who remained

---

[1]    *See* D.C. Department of Health Confirms First Coronavirus Case, Government of the District of Columbia (March 7, 2020), *available at* https://coronavirus.dc.gov/release/dc-department-health-confirms-first-coronavirus-case.

[2]    *See* WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3]    *See* Government of the District of Columbia, Mayor Bowser Declares Public Health Emergency (Mar. 11, 2020), *available at* https://mayor.dc.gov/release/mayor-bowser-declares-public-health-emergency.

[4]    *See* Government of the District of Columbia, D.C. Health Advisory (Mar. 11, 2020), *available at* https://coronavirus.dc.gov/release/dc-health-advisory.

[5]    Letter to the George Washington University Community, Important COVID-19 Message from President LeBlanc (Mar. 16, 2020), *available at* https://campusadvisories.gwu.edu/important-covid-19-message-president-leblanc.

on campus.[6]  GW's March 16 announcement emphasized that this challenging situation required

a change to *how* the University would complete its spring semester, but that the semester would

carry on.[7]  From March 23 through the end of the Spring semester, University faculty taught

classes remotely.  *See id.* ¶¶ 67, 70.  GW also offered students prorated refunds of housing,

dining, and parking fees.[8]

The current posture of the case reflects the consolidation of two earlier-filed cases:

*Shaffer v. George Washington University*, No. 20-cv-1145 (D.D.C.), which was filed on behalf

of Mark Shaffer (the parent of a current GW student), and *Mauldin v. Board of Trustees of the*

*George Washington University*, No. 20-cv-1417 (D.D.C.), which was filed on behalf of Margaret

Mauldin and Charafeddine Zaitoun (two current GW students).  Following a joint unopposed

motion to consolidate, Dkt. 16, the Court ordered that the matters be consolidated for all

purposes and that Plaintiffs file a consolidated amended complaint, Minute Order (July 1, 2020).

The consolidated complaint was filed on July 15, 2020, and added another Plaintiff, Marc Lessin

(like Shaffer, the parent of a GW student).  Compl. ¶ 14.  The consolidated complaint

substantially amplified the two original pleadings, including a new cause of action (breach of

implied contract) and, for the first time, direct citations to language in GW's 2019-2020 Bulletin.

*Compare* Dkt. 1 (original *Shaffer* complaint), *and Mauldin v. Board of Trustees of the George*

*Washington University*, No. 20-cv-1417, Dkt. 1 (D.D.C. May 28, 2020) (original *Mauldin*

complaint), *with* Compl. (consolidated complaint).

---

[6]      *See, e.g.*, Wardwell, University Dining Partner Ships Emergency Meal Kits to Students
Stuck On Campus, G.W. Hatchet (May 18, 2020), *available at* https://www.gwhatchet.com/
2020/05/18/university-dining-partner-ships-emergency-meal-kits-to-students-stuck-on-campus/.

[7]      *Id.*

[8]      COVID-19: Refunds & Financial Assistance, GW Campus Living and Residential
Education, *available at* https://living.gwu.edu/continuity-refunds.

On behalf of a putative class of individuals paying GW personally or on behalf of others, Plaintiffs seek a refund of tuition and fees, which they allegedly paid for in-person instruction and use of campus facilities that the University did not provide when it shifted to providing remote classes and other services.  Compl. ¶ 91.  On behalf of the putative class, Plaintiffs claim that GW (1) breached an express contract with Plaintiffs to provide in-person services, *id.* ¶¶ 104-112; (2) breached an implied contract with Plaintiffs to provide in-person services, *id.* ¶¶ 113-107 [sic]; (3) unjustly retained Plaintiffs' Spring 2020 semester tuition and fees but failed to provide services for which tuition and fees were collected, *id.* ¶¶ 122-134; and (4) wrongfully exercised control over and intentionally interfered with the rights of Plaintiffs by closing its campus to in-person instruction and related services, *id.* ¶¶ 135-140.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff's allegations are assumed to be true, but they cannot simply recite the elements of a cause of action and must be enough to raise a right to relief above a speculative level.  *See Coburn v. Evercore Tr. Co., N.A.*, 844 F.3d 965, 968 (D.C. Cir. 2016); *Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22, 27 (D.D.C. 2007).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS FOR BREACH OF CONTRACT SHOULD BE DISMISSED

Plaintiffs' claims for breach of contract do not satisfy clear D.C. law requiring that a plaintiff must ground a contract claim against a university in a specific, identifiable promise. Plaintiffs ground their claims for breach of contract—either express or implied—on language in the GW Bulletin and on GW's customary practices, which they say together give rise to a

binding promise to provide in-person instruction and services.  But no such promise was ever made.  The language in various GW documents that Plaintiffs say gives rise to an obligation to provide in-person instruction is exactly the kind of generalized language that D.C. courts have held unenforceable.  And Plaintiffs' effort to fall back on GW's supposedly enforceable "custom" of providing in-person instruction says nothing about GW's obligations in times that are anything but customary.

What *is* clear from GW's agreements with its students is that the tuition and fee refunds Plaintiffs seek are not available:  Fees are explicitly nonrefundable, tuition for the programs Plaintiffs participate in is linked to the number of credits a student receives rather than to the format of instruction, and the University retains discretion to make the kinds of changes to its programs that Plaintiffs now challenge.  What is more, D.C. law emphasizes that universities have broad discretion to make judgments about how to carry out their educational mission and that disputes over issues like how courses are taught are outside the courts' purview.  Plaintiffs' attempt to cobble together a purported contractual promise from aspirational statements would require the Court to restrain GW's discretionary educational decisionmaking in a way that firmly established D.C. law prohibits.

## A.     Plaintiffs Have Failed To Plead An Enforceable Contractual Obligation

Plaintiffs fail to do the bare minimum necessary to plead a claim for breach of contract— "indicate … the specific terms of [the] alleged contract" that GW allegedly breached.  *Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 125 (D.D.C. 2012); *see also Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012) (explaining that the burden is on the plaintiff to "allege sufficient facts to demonstrate … the terms of the contract" (citing *Manago v. D.C.*, 934 A.2d

925, 927 (D.C. 2007)).[9]  D.C. courts mandate that students alleging a breach of their contracts

with universities meet this requirement:  The alleged obligation that underlies the claim "must be

so definite in its terms … that the promises and performances to be rendered by each party are

reasonably certain."  *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977)

(internal quotation marks omitted).  A plaintiff must also plausibly allege the university's intent

to be bound by a particular statement.  *See id.* (evaluating whether "the University intended to

bind itself" "in the context of a university bulletin"); *Mosby-Nickens*, 864 F. Supp. 2d at 99

(looking to language of student rules and regulations and related indicia to determine intent to be

bound); *Shinabargar v. Bd. of Trustees of Univ. of Dist. of Columbia*, 164 F. Supp. 3d 1, 29

(D.D.C. 2016) (noting that student honor code was not an enforceable contract because it "lacks

… an intent to be bound").

Language that merely "expresse[s] an expectancy" fails to satisfy either of these

requirements.  *Basch*, 370 A.2d at 1368.  Because such language may involve "the types of

words that preclude accuracy by their very nature," the alleged promises inherent in such

statements are not sufficiently defined, nor the performance resulting from that expectancy

sufficiently certain, to create "a promise susceptible of enforcement."  *Id.* at 1367-68; *see also id.*

("It is well established that mere expectancy of a continued course of conduct is not enough,

even in situations where the disappointment of expectations results in a heavy financial loss.").

---

[9]     Plaintiffs file two separate counts for breach of contract—one for standard breach of
contract, and one pled in the alternative for breach of an implied contract.  The distinctions
between the two claims are muddy at best:  Both counts, for example, rely on GW's alleged
"usual and customary practice" of providing in-person instruction for the formation of the
purported contract, whether that contract is express or implied.  *See* Compl. ¶¶ 105, 107-08
(breach of contract count); *id.* ¶ 115, 117 (breach of implied contract count).  Indeed, the first
breach of contract count expressly incorporates what it deems "[a] material term of the bargain
and contractual relationship, whether express or implied."  *Id.* ¶ 109.  With no concrete
distinction between these claims, GW treats them together here.

Similarly, language that merely "communicate[s] [the University's] expectations … to its students" does not reflect an intent by a university "to bind itself to the … provisions" containing such language. *Mosby-Nickens*, 864 F. Supp. 2d at 99; *cf. Varner v. District of Columbia*, 891 A.2d 260, 272 (D.C. 2006) ("Aspirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence. … [T]o hold otherwise would create the perverse incentive for universities and their administrators to write their manuals in such a manner as to impose minimal duties upon universities in order to limit civil liability." (internal citation, alterations, and quotation marks omitted)).

### 1.    The University Bulletin Does Not Promise In-Person Instruction

Plaintiffs point to the 2019-2020 University Bulletin as "lay[ing] out the terms of the contract between GW and Plaintiffs." Compl. ¶ 45.[10]  While they are correct that "the relationship between a university and its students is contractual in nature" and "the terms set down in a university's bulletin become a part of that contract," *Basch*, 370 A.2d at 1366, every word of a university bulletin does not state a contractual term.  Instead, because university bulletins "customarily contain a great deal of information concerning what the prospective student may expect when he or she enters the university community," the mere presence of certain language in a bulletin "is not enough to support a finding that the language amounted to a contractual obligation." *Id.* at 1366-67.  Rather, "[w]hether a given section of the bulletin also becomes part of the contractual obligations between the students and the university … must depend upon general principles of contract construction." *Id.*

---

[10]    Plaintiffs attach the provisional version of the 2019-2020 Bulletin to their complaint.  The final version of the Bulletin is available at http://bulletin.gwu.edu/archives/2019-20.pdf, and relevant excerpts are attached hereto as Exhibit A.

In relying on the Bulletin, Plaintiffs fail to point to any provision "definite in its terms" promising in-person instruction. *Basch*, 370 A.2d at 1367.[11]  Plaintiffs try to conjure such an obligation from various Bulletin terms reflecting different policies about on-campus and online-only programs, Compl. ¶ 46—variously, unique registration procedures for on-campus students, *see* Exhibit A at 28, 36, tuition refund schedules for the withdrawal of on-campus students, *id.* at 64, 1065, automatic enrollment in student health insurance for on-campus students in the graduate School of Medicine and Health Sciences, *id.* at 1007, and a $35 fee assessed only to registrants in "off-campus and online programs," *id.* at 62.  Plaintiffs also point to language from the descriptions of individual courses discussing on-campus presentations, group work, training, and laboratory experiences.  Compl. ¶ 47; *see also* Exhibit A at 141, 1322, 1409, 1479, 1485. None of the statements Plaintiffs cite creates an obligation "definite in its terms" mandating that GW is contractually bound to provide in-person instruction and services.  Plaintiff cannot plead a contract-by-mosaic that strings together discrete individual statements into an unspoken, unwritten promise to provide in-person learning—let alone a promise that directly links in-person learning to the value of tuition or fees.

Further, Plaintiffs point to no other indicia suggesting that GW intended to be bound to provide in-person instruction—either in these particular provisions or anywhere else in the

---

[11]    While Plaintiffs also cite an array of GW promotional materials purportedly "touting the vitality of the campus experience" and discussing its online programs, *see* Compl. ¶¶ 32-40, they do not claim that those materials form part of the contract, *see id.* ¶ 45 (solely identifying the Bulletin as laying out the terms of the parties' contract), nor that GW intended for these statements to bind it to provide in-person instruction, *see Basch*, 370 A.2d at 1367; *Mosby-Nickens*, 864 F. Supp. 2d at 99.  In any event, the statements in the promotional materials are not sufficiently "definite in [their] terms" in a way that binds GW:  A student would self-evidently not have a claim for breach of contract if she failed to "become a part of the nation's capital and make a difference in it every day," *id.* ¶ 34, if she did not "find fellow Colonials who share [her] interests," *id.* ¶ 35, or if her "classmates, friends and professors" did not "motivate [her] to use what [she's] learning … to help others and pave a path for her future," *id.* ¶ 37.

Bulletin.  Without clear indications of such intent, the parts of the Bulletin that Plaintiffs highlight must be read only as "information concerning what the prospective student may expect when he or she enters the university community" rather than as a binding obligation.  *Basch*, 370 A.2d at 1367; *see also Mosby-Nickens*, 864 F. Supp. 2d at 99.

### 2.   "Customary Practice" Does Not Create A Contractual Obligation

Perhaps recognizing that the Bulletin does not say what they want it to say, Plaintiffs allege that GW is "contractually obligated to provide on-campus classes to Plaintiffs" because of its "usual and customary practice[] … to provide on-campus instruction."  Compl. ¶¶ 48-49.  But the "mere expectancy of a continued course of conduct is not enough" to form a binding contractual provision.  *Basch*, 370 A.2d at 1368.  GW's usual practice (and Plaintiffs' alleged expectation that it would continue) cannot elevate the various allusions to aspects of on-campus programs in the Bulletin into a binding obligation to provide in-person education.

Further, Plaintiffs offer no reason why contract terms alleged to be based in custom should dictate GW's obligations in times that are anything but customary.  That GW usually provides in-person instruction says nothing about GW's obligations when a world-altering global pandemic has reshaped the facts that justify that usual course.  *See Howard Univ. v. Best*, 484 A.2d 958, 974 n.14 (D.C. 1984) (stating that evidence of custom or usage is admissible to show "all those general *and unvarying* incidents which a uniform usage annexes" (quoting Restatement (First) of Contracts § 246 (1932)) (emphasis added)); *Itek Corp. v. First Nat'l Bank of Boston*, 566 F. Supp. 1210, 1216 (D. Mass. 1983) (where party to a contract had agreed to litigate disputes in courts of Iran prior to 1977 revolution as a matter of custom, holding that "[w]hat was contractually 'customary' and 'necessary' in 1977 does not, in the face of dramatically changed circumstances, exert binding force on the parties and this Court").  So

10

GW's customary practice does not create a definite contractual term, especially one enforceable in these uncustomary times.

### B.    Plaintiffs Have Failed To Allege Any Breach Of The Contract's Clear Terms

Plaintiffs' inability to cite any concrete promises that GW breached is unsurprising given what GW's agreements with its students *do* provide.  As for fees, Plaintiffs identify only one specific fee that they say was not refunded—a student association fee charged at $3 per credit hour.  Compl. ¶ 31; *see also id.* ¶ 50 (identifying $27 student association fee paid by Plaintiff Mauldin); *see also id.* ¶ 58 (stating that Plaintiff Zaitoun paid $96.25 in fees without specifying what the fees were).  But the Bulletin that Plaintiffs argue "lays out the terms of the contract between GW and Plaintiffs," *id.* ¶ 45, explicitly provides that undergraduate and graduate students "are assessed a *nonrefundable* student association fee," Exhibit A at 62 (emphasis added).  It also identifies a list of other "special fees and deposits" as nonrefundable.  *Id.*  This language forecloses Plaintiffs' contract claim for fees.  *See, e.g.*, *Martin v. United Airlines, Inc.*, 727 F. App'x 459, 462-63 (10th Cir. 2018) (plaintiffs had no breach of contract claim for refund of airline ticket payments where contract specified that the payments were nonrefundable).

The contract claims for tuition fare no better.  For the significant majority of undergraduates, the amount of tuition is tied to full-time status, which is defined by students taking a certain range of credits; for part-time undergraduate students, tuition is explicitly linked to the number of credit hours taken.  *See* Exhibit A at 62; *id.* at 92 (noting that for undergraduates at GW's Columbian College of Arts and Sciences, "registering for more than 17 credits in a given semester will incur additional tuition charges at the per-credit rate established by the University").  And for many graduate programs, including the Museum Studies graduate program pursued by Plaintiff Mauldin, tuition again is determined by the number of credits a student takes.  *See* Exhibit B, Graduate Tuition & Fees, Columbian College of Arts & Sciences,

Summer 2019, Fall 2019, and Spring 2020 (stating that Museum Studies graduate program tuition is charged per credit); *see also* Exhibit A at 62 (incorporating website listing graduate student tuition rates into Bulletin). Plaintiffs do not allege that they were deprived of the credit hours they paid for, and so they do not plausibly allege any failure by GW to live up to its end of the parties' bargained-for exchange. The Bulletin's policies for tuition refunds where a student withdraws are instructive. The Bulletin states that for a "withdrawal dated after the fourth week of the semester," there is *no* refund of tuition. And so a student who *withdrew* from the University on March 23—the day classes were first held remotely as a result of COVID-19— would have received no tuition refund, even though he was not receiving any educational services at all (in-person or otherwise). Plaintiffs cannot plausibly allege they were entitled to a more generous refund policy where all their classes were conducted through semester's end (though in a different format) and they obtained the course credit they expected.

Significantly, the Bulletin also provides that GW "reserves the right to change courses, programs, fees, and the academic calendar, or to make other changes deemed necessary or desirable, giving advance notice of change when possible." Exhibit A at 2. Separately, it states that "[t]he University reserves the right to modify or change requirements, rules, and fees. Such regulations shall go into force whenever the proper authorities may determine. The University reserves the right to make changes in programs without notice whenever circumstances warrant such changes." *Id.* at 34, 40. This reservation of rights precludes Plaintiffs' efforts to recover under the parties' contract. *See Beukas v. Bd. of Trs. of Farleigh Dickinson Univ.*, 605 A.2d 708, 708-09 (N.J. Super. Ct. 1992) (finding that university officials' reservation of right in university bulletins to eliminate any college within university subject only to giving adequate notification to its students precluded recovery under express contract theory); *cf. Eisele v. Ayers*, 381 N.E.2d

21, 26 (Ill. App. Ct. 1978) (where university catalog provided that tuition rates were subject to change "without notice" or "on short notice," students could not sue for year-over-year increases of tuition absent allegations of malice or bad faith).

Plaintiffs acknowledge this provision but claim that they "reasonably understood this to mean that, although specific classes might be canceled or campus events rescheduled, one thing would remain constant:  Under their contract with Defendants, they would receive on-campus instruction and the core benefits that accompany it."  Compl. ¶ 60 n.19.  This alleged understanding is baseless.  The four corners of the reservation itself states without limitation that GW could change entire programs—a reservation of rights at odds with Plaintiffs' artificially narrow expectation only that "specific classes might be canceled or campus events rescheduled." And the reservation of rights to change fees without notice, necessarily including changes upward, conflicts with Plaintiffs' claim that their contract with GW entitles them to a *refund* of fees.

Since the contract terms make clear that there was no breach, Plaintiffs' claims for breach of contract must be dismissed.[12]

---

[12]    The contract claims of Plaintiffs Shaffer and Lessin fail for another independent reason: "It is fairly evident that the 'payment of tuition does not create a contractual relationship between parents and a college' when the parents' child is over the age of majority."  *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 761 (E.D. Tenn. 2009) (quoting *Apffel v. Huddleston*, 50 F. Supp. 2d 1129, 1133 (D. Utah 1999)).  Rather, "[w]hen a child reaches the age of majority, such 'standing simply transfers from the parent to the child.'"  *Id.* (quoting *Loch v. Bd. of Educ.*, 2007 WL 2701274, at *2 (S.D.N.Y. Sept. 17, 2007)).  Thus, even if the Court finds that Plaintiffs have sufficiently alleged at the motion to dismiss stage that an enforceable contract to provide in-person education exists between GW and its students, Shaffer and Lessin may not pursue claims seeking to enforce that contract because they are parents, not students themselves.  Compl. ¶¶ 11, 14.

###### C.      D.C. Law Counsels Against Second-Guessing Educational Judgments

All of this—Plaintiffs' failure to identify any definite, concrete promise to provide in-person instruction as the basis for a refund of tuition or fees; their related failure to point to anything indicating GW's intent to be so bound; and the fact that what GW's Bulletin *does* say about tuition and fees has nothing to do with any such promise—dooms Plaintiffs' contract claims.  Reinforcing that conclusion is a consistent body of District of Columbia law cautioning courts to leave decisions about academic programs, the granting of course credit, and the issuance of degrees to the professional educators who deal with the educational process every day.

D.C. law—like the law of virtually all jurisdictions—counsels that discretionary educational decisions "be left to the sound judgment of … professional educators."  *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999).  Courts accordingly will not intervene in disputes between student and university about the quality or value of the education that has been provided.  As the D.C. Court of Appeals has long made clear, courts are not equipped to make these assessments in view of "(1) the lack of a satisfactory standard of care, (2) the 'inherent uncertainties' about the cause and nature of damages, (3) the 'potential it presents for a flood of litigation against schools,' and (4) the threat of 'embroiling the courts into overseeing the day-to-day operations of the schools.'"  *Brantley v. Dist. of Columbia*, 640 A.2d 181, 184 (D.C. 1994) (quoting *Ross v. Creighton Univ.*, 957 F.2d 410, 414 (7th Cir. 1992)); *see also Alden*, 734 A.2d at 1108 (D.C. 1999) (observing that the court had previously "declin[ed] to engage in judicial review of academic decision-making by educational institutions"); *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) ("[C]oncepts of academic freedom and academic judgment are so

14

important that courts generally give deference to the discretion exercised by university officials.").[13]

In short, in cases that ask the court to "determin[e] whether a university has complied with its own rules or contract, … 'a court must be careful not to substitute its judgment improperly for the academic judgment of the school.'"  *Allworth*, 890 A.2d at 202 (quoting *Neiman v. Yale Univ.*, 851 A.2d 1165, 1172 (Conn. 2004)) (second alteration in original)); *see also Richter v. Catholic Univ. of Am.*, 2019 WL 481643, at *5 (D.D.C. Feb. 7, 2019) (Leon, J.) (citing *Allworth* and *Alden* and stating in a case involving an academic dismissal that the Court "will not 'substitute [its] judgment improperly for the academic judgment of the school'" (quoting *Chenari v. George Washington Univ.*, 847 F.3d 740, 745 (D.C. Cir. 2017))).  This deference extends to both academic decisions and all other facets of campus and university life, including fees assessed for non-curricular campus services, because ascertaining which university services are "educational" is itself an exercise in academic decisionmaking that requires "inquir[ing] into the nuances of educational processes and theories."  *Roe v. Saint Louis Univ.*, 2012 WL 6757558, at *10 (E.D. Mo. Dec. 31, 2012), *aff'd*, 746 F.3d 874 (8th Cir. 2014).

---

[13]    The case law is consistent across jurisdictions.  *See, e.g.*, Standler, *Educational Malpractice Law in the U.S.A.* 43 (2013), *available at* http://www.rbs2.com/edumal3.pdf (collecting cases from 21 states and noting that "it is now very well established law that educational malpractice is *not* a viable tort in the USA" (emphasis in original)); *see also André v. Pace Univ.*, 655 N.Y.S.2d 777, 779 (N.Y. App. Div. 1996) ("To entertain a cause of action for 'educational malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies—a course we have unalteringly eschewed in the past—but, more importantly, to sit in review of the day-to-day implementation of these policies." (quoting *Donohue v. Copiague Union Free Sch. Dist*., 391 N.E.2d 1352, 1354 (N.Y. 1979))); *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 251 (6th Cir. 2005) (stating that claims are barred if they "challenge the adequacy of the education that Vanderbilt provided"); *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013) (Missouri courts have "emphasized that it is not [their] place to micromanage a university's daily operations" and that "universities must be allowed the flexibility to manage themselves.").

As a result, where campus services are "integrally related to the educational process and to student wellbeing," claims concerning the terms on which those services are rendered are equally subject to the rules governing judicial noninterference described above. *McClean v. Duke Univ.*, 376 F. Supp. 3d 585, 609 (M.D.N.C. 2019) (plaintiff's allegations that the university failed to provide her with counseling services it had advertised or promised were barred); *see also Roe*, 2012 WL 6757558, at *10 ("[I]t would require the Court to inquire into the nuances of what should be determined 'state of the art' physical training program.").

Courts have applied this doctrine to forbear from deciding all sorts of disputes between students and their schools, including where schools are constrained to cancel classes as a result of national crises. In *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971), a student's father sought a tuition refund after New York University cancelled all classes for the rest of the school year in the wake of the Kent State massacre. The appellate court reversed a judgment for the father, holding that "the court erred in substituting its judgment for that of the University administrators and in concluding that the University was unjustified in suspending classes for the time remaining in the school year prior to the examination period." *Id.* at 894. The court went on to note that "while in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year, the services rendered by the university cannot be measured by the time spent in a classroom." *Id.* *Paynter* thus stands for the principle that the education provided by a university cannot be evaluated mechanically, and universities have leeway, not subject to judicial review, in determining how to shape the educational process in response to unforeseen and dangerous extrinsic events.

GW stands behind the quality and value of the education it delivered during the pandemic. That education satisfied its high standards, and so GW has granted course credit to

16

students who completed their classwork remotely.  Plaintiffs' lawsuit asks this Court to second-guess that judgment to conclude that Plaintiffs' education and degrees are somehow worth less. Plaintiffs do not allege that they paid for credits that they or their children did not receive.  They instead seek damages or disgorgement (*see* Compl. ¶¶ 112, 121, 134, 140) for the purported and undefined "difference in value between … live in-person classes" and college experience and the allegedly "lesser online versions."  *Id.* ¶ 8; *see also, e.g.*, *id.* ¶ 2 (alleging they were deprived of a "well-rounded, on-campus educational experience"); *id.* ¶ 6 (claiming that "online classes that Defendants provided … are substantially less valuable than the in-person classes that Defendant … promised"); *see also id.* ¶¶ 2, 6-7, 16, 20, 42, 72-73, 78-80.

Plaintiffs' claims thus ask the Court to assess the value of a GW education and to assign a financial difference between its assessment and the tuition charged by GW.  Under settled D.C. law, courts do not make such assessments.  The logic of this principle proves itself here.  What would the deliberations look like for the claims of a hypothetical English major:  Is a remote discussion section in her World Literature class truly of lower quality than the discussion sections held in person before the pandemic?  Can the same be said for large lecture classes that involve less face-to-face interaction?  Has she been deprived of $1,000 in the value of her education, or is it $2,000?  Does it matter if the student continues to use remote library services, or if she never used the library in the first place?  Was the student's coursework during the pandemic truly good enough to earn the credit that GW granted her towards her degree?  And if she got her course credits for the class, how does one offset the value of those credits?[14]

---

[14]     The threat that litigation would proliferate is palpable.  If the Court entertained claims like Plaintiffs', what would prevent a student from suing for a partial tuition refund if the tenured professor listed as teaching a class in the university bulletin fell ill partway through a semester and his class was taught by a graduate student instead?  And what would stop a lawsuit from a student who believes her university's decision to change a course advertised in the bulletin as

To answer any of these questions, the Court would have to make the very kinds of determinations that courts have said are outside the scope of judicial review.[15] Settled D.C. law counsels against letting these claims proceed.

## II. PLAINTIFFS' OTHER CAUSES OF ACTION ALSO SHOULD BE DISMISSED

### A. Plaintiffs Fail To State A Claim For Unjust Enrichment

"[T]here can be no claim for unjust enrichment when an express contract exists between the parties." *Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004). Nor will an unjust enrichment claim lie where there is an "implied" contract covering the matter in dispute, as Plaintiffs also allege. *Schiff v. AARP*, 697 A.2d 1193, 1194 n.2 (D.C. 1997). Plaintiffs try to sidestep this clear prohibition by claiming that they plead their unjust enrichment claim in the alternative (Compl. ¶ 123) and by alleging that "[t]o the extent Defendants contend that the Bulletin permits them to unilaterally and without notice change the terms under which Plaintiffs and Class [M]embers were to receive instruction,

---

being graded to being subject to mandatory pass/fail grading diminishes the value of her degree? Or what about a lawsuit that seeks a pro rata refund every time classes are cancelled due to adverse weather? This is a slippery slope on which this Court should not embark.

[15] Plaintiffs do not avoid these problems by "seek[ing] disgorgement and monetary damages in the amount of prorated, unused amounts of tuition and fees." Compl. ¶ 8. Prorating tuition requires determining by what percentage they should be prorated. Unless the Court were to find that the value of GW's remote courses is zero—not an allegation Plaintiffs themselves make, nor one supported by the complaint—choosing the proration percentage would still require the Court to answer all the questions above that other courts have found are not susceptible to judicial review. This is true even given that, as discussed in the complaint, GW has tuition rates set for pre-existing online degree programs: Plaintiffs themselves allege that there are differences between the remote classes offered by GW during the pandemic and those offered as part of its standard online degree programs, *see, e.g.*, *id.* ¶ 73, so setting the proration percentage would still require the Court to compare the remote courses being offered to Plaintiffs during the pandemic not only to on-campus classes, but also to those pre-existing online courses (either to identify differences and assign value to those differences, or to identify equivalent qualities that would justify using the online degree tuition rates as a benchmark for proration).

from on-campus to remote, the promises made by Defendants to Plaintiffs and Class Members to provide on-campus instruction were illusory and no contract exists between the parties" (*id.* ¶ 124).  Both contentions are meritless.

As to the first, there is no "alternative" scenario to plead.  There is no dispute that the relationship between GW and its students is contractual in nature and that the Bulletin forms part of that contract.  *Basch*, 370 A.2d at 1367.  But here, the purported contract that Plaintiffs allege covers the subject matter of Plaintiffs' claims—the Bulletin—simply does not say what Plaintiffs wish it said.  As discussed above, the Bulletin directly addresses tuition and fees (and does so without linking that to any promise of in-person instruction).  *See supra* at 11-13.  While the parties dispute GW's contractual obligations, that dispute in no way undermines the settled conclusion that the student-university relationship is indeed contractual.

The second contention fares no better.  Plaintiffs' formulaic allegation that their agreements with the University are illusory is implausible.  An agreement is illusory where it "gives consideration that is so insignificant that an actual obligation cannot be imposed," *Shatteen v. Omni Hotels Mgm't Corp.*, 113 F. Supp. 3d 176, 181 (D.D.C. 2015), or where "performance of [a] promise is optional," *Davis v. Joseph J Magnolia, Inc.*, 640 F. Supp. 2d 38, 45 (D.D.C. 2009).  Plaintiffs nowhere alleges that the consideration provided by GW was insignificant—nor can they, given that GW provided them with nearly a year's worth of in-person education and services as consideration for their tuition and fees.  Further, because changes to GW's academic programs rest on GW's own assessment of what is "necessary or desirable," Exhibit A at 2, its exercise of judgment in making those changes is thus constrained by an implied duty of good faith—and that "obligation to act in good faith constitutes consideration on the part of the obligor, and saves the agreement from being merely illusory,"

*Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car of Md.*, 1989 WL 39393, at *5 (D.D.C. 1989). Given the clear dangers of the COVID-19 pandemic and the government stay-at-home orders mandating the closure of educational facilities, there is no plausible allegation here that GW acted in anything but good faith in shifting to remote coursework and services.  So Plaintiffs' claim that their contract with GW is illusory is meritless, and their claim for unjust enrichment is barred.

Relatedly, "[u]nder District of Columbia law, where a claim of unjust enrichment is based on the same set of facts that provide the basis for an asserted breach of contract claim, the unjust enrichment claim must be dismissed."  *Bakeir v. Cap. City Mortg. Corp.*, 2011 WL 13244122, at *4 (D.D.C. Dec. 28, 2011) (citing *Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp.*, 944 A.2d 1055, 1075-76 (D.C. 2009)).  That is exactly the case here:  Both Plaintiffs' contract claims and their unjust enrichment claim are premised on their payment of tuition and fees and GW not providing in-person instruction and services in exchange for those fees.  This clear, coterminous overlap means that the equitable claim must be dismissed.

Moreover, even if Plaintiffs could plead this claim, they fail to adequately allege that GW was unjustly enriched by retaining their tuition or fees.  To make out an unjust enrichment claim under D.C. law, a plaintiff must allege that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)) (internal quotation marks omitted).  As the D.C. Court of Appeals has explained, "the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the benefit."  *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005)

20

(quoting *4934, Inc. v. Dist. of Columbia Dep't of Emp. Servs.*, 605 A.2d 50, 56 (D.C. 1992)) (internal quotation marks omitted); *see also id.* at 66 n.7 ("The most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust." (internal quotation marks omitted)).

This is precisely where Plaintiffs' claim falls short.  The complaint includes threadbare recitals of the elements of an unjust enrichment claim, Compl. ¶¶ 122-134, but provides no supporting allegations that GW *inequitably* retained the cost of tuition or fees paid by Plaintiffs. In fact, Plaintiffs have nowhere alleged—nor can they—that GW used their tuition and fees for any purpose other than to further the educational goals of the University.  And Plaintiffs do not allege that they received no benefit from GW's expenditures; they (or their children) are still receiving credit towards their degrees, and they and other students continued to receive remote instruction for the balance of the Spring semester.  *See id.* ¶ 67 (acknowledging that learning was being conducted remotely and that the University "will remain open and operational").  When— as here—a plaintiff benefited from the defendant's retention of the original benefit, that retention is not unjust, and an unjust enrichment claim must be dismissed.  *See Roebling v. Dillon*, 288 F.2d 386, 387 (D.C. Cir. 1961) (where transaction between parties aligned with plaintiff's "desire to restore the banking corporation, of which she was a major shareholder, to a sound financial condition," defendant's retention of benefit was not unjust); *see also Moss v. Wayne State Univ.*, 2009 WL 4344193, at *2 (Mich. Ct. App. Dec. 1, 2009) (where university charged a "contingency fee" to protect against state budget shortfalls that did not materialize, rejecting plaintiff's argument that university was unjustly enriched by failing to refund that fee where students "gained a general benefit from the university's expenditures, which included spending in areas that would directly benefit students"); *cf. Ascom Hasler Mailing Sys., Inc. v. U.S. Postal*

*Serv.*, 885 F. Supp. 2d 156, 188-89 (D.D.C. 2012) (not unjust for U.S. Postal Service to retain benefit because the retention was motivated by customer service and security concerns).

Finally, dismissal of the unjust enrichment claim tracks settled D.C. law foreclosing claims that implicate a university's academic decisionmaking.  The same principles discussed above (at 14-18) apply wherever the principles that animate it are implicated, without respect to the particular cause of action.  *See, e.g.*, *Jung v. George Washington Univ.*, 875 A.2d 95, 108-09 (D.C. 2005) (doctrines of "academic deference" and "judicial reluctance to intervene" apply equally to claim raised under D.C. Human Rights Act).  Because Plaintiffs' unjust enrichment claim requires the same analysis of the quality of GW's instruction and of its academic decisionmaking, *see, e.g.*, Compl. ¶¶ 130-131 (unjust enrichment claim premised on allegation that GW provided "something far less comprehensive" than the "comprehensive academic experience" Plaintiffs expected), to render judgment for Plaintiffs on that claim, the Court would need to ask and answer the same questions that render the contract claim unreviewable, *see supra* at 17.  Consequently, even apart from Plaintiffs' failure to adequately allege the elements of their unjust enrichment causes of action, that claim should be dismissed.  No court in the District of Columbia has ever permitted an unjust enrichment claim against a university for failure to provide a promised level or quality of education.  There is no legal support for Plaintiffs' effort to plead such a claim here.

### B.    Plaintiffs Fail To State A Claim For Conversion

Plaintiffs' conversion claim fails for four reasons, each of which provides a freestanding basis to dismiss.

First, conversion claims for money require the identification of specific segregable funds; a claim will not lie to enforce a general obligation to pay money.  *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 236, 258 (D.D.C. 2015).  The complaint includes no

allegation meeting this demanding standard.  *See* Compl. ¶¶ 135-140.  Plaintiffs allege only that

they "pa[id] Defendants tuition, fees, and/or room and board" and thus received a right to receive

in-person instruction.  *Id.* ¶ 136.  To make out a claim for conversion, a plaintiff must show that

she personally paid a particular amount to a defendant who put "*those exact funds*" to an

improper purpose, *McNamara v. Picken*, 950 F. Supp. 2d 193, 195 (D.D.C. 2013), but Plaintiffs

make no such allegation here.  To the contrary, tuition and funds paid to the University are

exactly the kind of "fungible cash … that may not underlie a claim for conversion."  *Id.*

(dismissing conversion claim where plaintiff alleged only that he contributed to general accounts

and that money from the general accounts was misdirected); *see also Edwards v. Ocwen Loan*

*Servicing, LLC*, 24 F. Supp. 3d 21, 31 (D.D.C. 2014) (Leon, J.) ("A conversion claim cannot

stand where, as here, plaintiff is owed *at most* some unspecified, unidentified portion of a larger

pool of funds." (emphasis in original)).  When, as here, Plaintiffs allege that they are "entitled to

a refund or credit for an overcharge," the complaint "fails to state a claim for conversion."

*Campbell*, 130 F. Supp. 3d at 259.

Second, the conversion claim is insufficiently distinct from Plaintiffs' contract claims to

survive.  Both types of claims turn on the contention that GW may not retain funds paid to it in

exchange for certain unperformed services under a contract.  That is a contract claim—not a

claim for conversion.  *See Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 n.13

(D.C. 2008) ("Failure by a contracting party to pay the contract price or debt … is not a

conversion but merely breach of contract."); *McNamara*, 950 F. Supp. 2d at 195.

Third, for the reasons discussed above for the unjust-enrichment claim (*see supra* at 20-

22), Plaintiffs cannot plausibly allege conversion where they acknowledge that GW has

effectively transitioned to remote and alternative learning, enabling students to continue to avail

themselves of University resources and services.  *See* Compl. ¶ 67.  To state a claim for conversion, Plaintiffs must allege that GW diverted their funds "in denial or repudiation of [Plaintiffs'] right to" the disputed property, with the claim arising from a common-law action available against those who covered property "to the finder's own use."  *Shulman v. Voyou, LLC*, 251 F. Supp. 2d 166, 170 (D.D.C. 2003).  Plaintiffs make no such allegation here—indeed, given the University's successful effort to continue students' education in the face of the pandemic, they can hardly allege that GW used the money they paid for anything but its intended purposes or in derogation of their rights.

Finally, the conversion claim fails because, like the contract and unjust enrichment claims, it invites the Court to insert itself into GW's academic decisionmaking.  *See* Compl. ¶ 140 (conversion claim alleging that Plaintiffs were damaged because they were deprived of "rights, benefits, services, and/or facility access").  Because the Court cannot render judgment for Plaintiffs on their conversion claim without engaging in the same searching inquiries described above, *see supra* at 17, the conversion claim should be dismissed.

## III.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Finally, Plaintiffs' complaint should be dismissed with prejudice.  Through consolidation, the complaint adds new allegations that did not appear in either of the original *Shaffer* or *Mauldin* complaints—including, for the first time, allegations concerning the terms of GW's Bulletin.  *See supra* at 4.  But, as discussed throughout this brief, these amended allegations do nothing to help Plaintiffs.  What is clear is that the problem is not with Plaintiffs' allegations; it is a problem with their legal theories.  Against the legal backdrop stating that the student-university relationship is contractual and that universities are due deference to decisions involving their academic and related programs, Plaintiffs' claims are fundamentally and irreparably flawed.  Consequently, because amendment would be futile, dismissal with prejudice

is warranted. *Vince v. Mabus*, 956 F. Supp. 2d 83, 92 (D.D.C. 2013) (citing *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996); *Carty v. Author Sol'ns, Inc.*, 789 F. Supp. 2d 131, 135-36 (D.D.C. 2011)).

## CONCLUSION

For these reasons, Plaintiffs' complaint should be dismissed in its entirety with prejudice.

Dated: August 12, 2020

Respectfully submitted,

*/s/ Jamie S. Gorelick*
Jamie S. Gorelick (#913384)
Bruce M. Berman (#333948)
Danielle Y. Conley (#503348)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel.: (202) 663-6006
jamie.gorelick@wilmerhale.com
bruce.berman@wilmerhale.com
danielle.conley@wilmerhale.com

Alan E. Schoenfeld (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
alan.schoenfeld@wilmerhale.com

*Attorneys for Defendants The George Washington University and The Board of Trustees of the George Washington University*